CUMMINGS & a. v. PARKER & a.

A deed of a tract of land described by certain metes and bounds, "and all the canal water privilege," *held* not to convey half of the bed of a river, and not to limit the privilege to half of the power; and other deeds construed not to convey half of the stream as a part of a lot on the opposite side.

CASE, for diverting water from the plaintiffs' grist-mill. The following facts were found by a referee: The plaintiffs are owners of a grist-mill on the easterly side of the Ammonoosuc river in the village of Lisbon, and the defendants are owners of a box-factory and lumber-mill on the westerly side; and both parties have heretofore taken water for the use of their respective mills from the same dam. No question of prescriptive right was raised at the trial.

For many years before March 16, 1812, there had been a dam across the river, at or near the site of the present dam, and a grist-mill and saw-mill on the easterly bank, which took water therefrom.

March 16, 1812, James I. Swan was seized in fee of the land on both sides of the river at the dam, as well as of all above and below that has anything to do with the present controversy; and on that day he conveyed to Stephen H. Whiting certain premises on the easterly side of the river by the following description: "A certain tract or parcel of land situated in Concord in said county of

Grafton being part and parcel of lot numbered one in the first and second ranges called the Mill lot and the same conveyed to Israel Swan and myself by James Young and others as per their deed, and by said Israel as to his part conveyed to me, bounded as follows, to wit: beginning at an oak tree standing a small distance north-westwardly of my store, thence running to a stake and stones on the westwardly side of the road directly opposite to the south-westwardly corner of the acre of land conveyed by Jesse Young to William Bean, thence northwardly by the westwardly side of the road as that runs to the north line of said lot, thence westerly on said north line of said lot to the mill-pond, thence southwardly down the mill-pond to the canal, thence down the canal to the north-east corner part of the saw-mill, thence to the north-west corner part of said saw-mill and on to the plot conveyed by Ruby Young, administratrix of Jesse Young to Richard Gookins, thence by said Gookins' plot to the oak tree begun at, together with the said mill apparatus and utensils and all the canal water privilege and a proportionate right in the main dam across the river, saving, excepting, and reserving to myself, heirs, and assigns forever the exclusive right of the grist or corn-mill with two sets of stones, and to draw water from said canal sufficient to supply the same in preference of any and all other machinery whatever, together with the road or way to the same. Also reserving to the public the road over the bridge, hereby intending to convey all that plot and mill privilege situated west of the road and east of the river extending from the oak tree by the lines aforesaid to the north line of the mill lot, saving only to myself, heirs and assigns the grist or corn-mill exclusively with its privileges and ways as aforesaid, and to Richard Gookins all the plot and privileges conveyed to him by Ruby Young as per her deed to him, reserving to the public the road over the bridge as aforesaid." The true construction of this deed was one of the questions raised at the trial,—it being contended on the part of the plaintiffs that it carried all the water-power at the dam mentioned therein except that pertaining to the grist-mill, leaving no right to take and use water from said dam for milling purposes appurtenant to this remaining land of the grantor on the west side of the river; while the defendant contended that it made the thread of the stream the westerly boundary of the premises conveyed, and so conveyed no water rights that then belonged to the land on the westerly side.

James I. Swan died in April, 1820, seized of the grist-mill and all the land on both sides of the river, the title or conveyances of which bear upon the present controversy, except the saw-mill deeded to Whiting as above. Swan left a will, empowering his executor to sell and convey his real estate.

June 13, 1822, Hamlin Rand, executor of James I. Swan, conveyed to Orlando Kelsey land on the west side of the river by the following description: "A certain tract or parcel of land situated

in said Concord on the west side of Ammonoosuc river, in said Concord containing about seven acres be the same more or less, and bounded as follows, to wit: beginning at the mill-dam where it now stands, opposite the mill lot conveyed by James Young and others to said James I. Swan by deed bearing date 22d August, A. D. 1808, recorded May 25, A. D. 1809, liber 49, fol. 78, thence down said Ammonoosuc river about twenty rods to a stake and stones, thence up the bank of said river two rods to a stake and stones, thence northerly about fourteen rods across the road leading from the mills to Lyman to a stake and stones, thence on said road northerly as it now tends up the hill to a stake and stones, thence easterly on a straight line to the said river seven rods above said mill-dam, thence to the bounds begun at; meaning hereby to convey one acre of land conveyed by James Young and others by their deed aforesaid to said James I. Swan, held by the levy of his execution against Joseph Coon, with the privilege of taking sufficient water from said mill-dam and pond to carry a trip hammer, saving, reserving and excepting to said Rand in his said capacity all water privileges upon said premises, and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying to the said Kelsey whatever damages shall accrue to said land by the use aforesaid, the damage to be appraised by three uninterested persons chosen by said Kelsea and the said Rand."

April 5, 1824, Hamlin Rand, executor, conveyed to Wm. Morrison " two certain tracts of land with the grist-mill, mill-dam and waterfall appurtenant thereto," describing the premises as the " mill lot," with a number of parcels (not material) excepted. The deed may be referred to in full if either party desires.

On the same day, April 5, 1824, Wm. Morrison conveyed the same premises, by the same description, to Hamlin Rand, in his individual capacity.

July, 23, 1831, Orlando Kelsea conveyed to Hamlin Rand part of the premises conveyed to him by Rand as executor of James I. Swan by the deed of June 13, 1822, being one acre on the west side of the river, by the following description: " Part of the same premises conveyed to me by said Rand by deed bearing date June 13, A. D. 1822, and bounded as follows : beginning about seven rods above the mill-dam across Ammonoosuc river near the mills in Lisbon village, at a stake and stones at the edge of the water, thence down said river by the mill-dam and under the bridge about twenty rods below mill-dam to a hole drilled in rock at the edge of the water, from thence westerly up the bank about two rods to the road leading from the bridge to Jotham Sherman's to a stake and stones, from thence up the river by said road to the road leading from Lisbon to Lyman, thence northerly across said road to a stone monument on the northerly side of said road about

twenty feet from the north-west corner of the bridge aforesaid, thence northerly by four stone monuments standing on a curve line upon the upper side of the road leading from said Lyman road to Joseph Boynton's about two hundred and twelve feet to a stone monument, thence turning and running about forty feet to bounds began at. Also I convey to him, the said Rand, by this instrument all my right to any water-privileges which the aforesaid deed of June 13, A. D. 1822, may have given me."

Thus it appears that July 23, 1831, all the title which James I. Swan, at the time of his death, had to land and water-rights on both sides the river was in Hamlin Rand. Those water-rights were all that were then appurtenant to the land on the east side of the river, excepting such as passed by the deed of Swan to Whiting, and all water-rights more or less which were then appurtenant to the land on the west side.

March 28, 1832, Hamlin Rand made to Joseph Boynton a lease of premises on the west side of the river as follows : " The said Hamlin Rand in consideration of the covenants hereinafter contained on the part of the said Joseph Boynton to be performed, hath demised and leased unto the said Joseph Boynton, his heirs and assigns (subject to be determined and also subject to the limitations and reservations hereinafter expressed) a right and privilege to take water out of the westerly side of the mill-pond in Lisbon village so called, and draw the same on the westerly bank of the river across land owned by said Hamlin about twenty rods to the tannery of the said Joseph sufficient to enable the said Joseph to grind bark and full and roll leather at his said tannery, and to supply his vats with water and for no other purpose during the time that the said Joseph shall well and truly perform the conditions on his part contained in this lease, or till the sum shall be determined according to the limitations and reservations hereinafter expressed. And the said Joseph on his part covenants and agrees to and with the said Hamlin, his heirs and assigns to pay him or them the sum of five dollars annually for the privilege aforesaid, and not to draw the water from said pond so as in any way or at any time to interfere with the rights and privileges incident to the mills on the easterly side of said river, or draw any water when it may be wanted for said mills. And the said Joseph further covenants and agrees with the said Hamlin that if the said Hamlin should erect a factory or mill of any description on the land over which the water is to be carried to the tannery aforesaid or sell said land to any person for the purpose of erecting mills or factories then this lease may and of no effect at the option of said Hamlin."

The water granted by this lease was for use by the lessee on a piece of land called the tannery plot, lying on the river, on the west side, adjoining Rand's land below ; and it is the same land now owned and occupied by the defendants, on which their mill is

located. The plaintiffs contended that if the defendants have any right to take water from the dam, or any water-rights at all on the west side of the river, they hold such rights by virtue of the above lease from Rand to Boynton, and in accordance with the terms of said lease, and not otherwise. The plaintiffs, however, did not admit that the defendants have any rights by virtue of the lease; while the defendants unequivocally disclaimed to hold or occupy anything under it, basing their right upon a different ground, as is shown below. There was no evidence that the lease was ever assigned by Boynton to any occupant of the tannery plot, unless a simple conveyance of the tannery plot, by metes and bounds, constitutes such evidence; and there was no evidence of the payment of rent by anybody. But the successive occupants of the tannery plot continued to draw and use water substantially according to the lease after the conveyance thereof by Boynton, as well as before. At the time Elisha Presby (mentioned below) conveyed one half the tannery plot to Joseph and James Parker and Whipple, his claim to water-rights in connection with that plot was by virtue of a lease for one year. After the expiration of that lease (which expired after Presby's deed to the Parkers and Whipple of Feb. 1, 1840), the Parkers and Whipple obtained from Robert Rand a bond for a deed of what was afterward conveyed by said Rand to them by his deed of May 5, 1843. It appeared that this bond was in the hands of the defendants' counsel at the time of the trial. It was called for by the plaintiffs' counsel, but the defendants' counsel refused to produce it, and it was not seen by the referee.

One undivided half of the tannery plot passed by deed from Joseph Boynton to Goodall & Johnson, February 24, 1832, and the other half to the same grantees January 22, 1833; thence through a number of mesne conveyances it came to Joseph Parker, James Parker, and Calvin Whipple,—one half by deed of Elisha Presby, Feb. 1, 1840, and one half by deed of Robert Rand, May 5, 1843.

Hamlin Rand died in 1836 seized of all the water-rights which were in him July 23, 1831, unless the right granted by his lease to Joseph Boynton was thereby annexed to the tannery plot in such way that it passed to successive grantees by the deeds of said plot.

It appeared that during his lifetime Hamlin Rand had had some business connection, by way of partnership or otherwise, with his brother, Robert Rand, or at all events, that Robert, after the death of Hamlin, claimed such to have been the fact; and he also claimed that he was, in equity and law, an equal owner with Hamlin of all the land and water rights on both sides the river, as well as of other real estate which then stood in the name of Hamlin. This claim was so far recognized by the heirs at law of Hamlin that it was compromised and settled by them by the execution, May 4, 1843, of a deed by said heirs to Robert of a large number of parcels of land then standing in the name of Hamlin, among which were the following, " also the tannery land and buildings thereunto

belonging, and the mill privilege connected therewith, all situate in said Lisbon." and by the execution on the same day by Robert to said heirs of a deed of a large number of parcels of land then standing in the name of Hamlin Rand, among which was "the grist-mill with all the land and privileges thereto belonging."

The next day, May 5, 1843, Robert Rand conveyed to Joseph Parker, James Parker, and Calvin Whipple one half the tannery plot, as above stated, which had before come to H. Rand, "also a certain plot called the mill privilege on the west side of the river in said village, bounded as follows: Beginning at a point about seven rods above the mill-dam across the river in said village; thence down the river to the north-east corner of the tannery plot; thence by the north line of the tannery plot to the road; thence along the east side of the road to a stone monument at the corner of land owned by Isaac Parker, Jr.; thence along said Parker's line to the bound begun at." The last named parcel is the same as that described in the above deed from the heirs of Hamlin Rand to Robert Rand as "the mill privilege connected therewith."

Thus, May 5, 1843, Joseph Parker, James Parker, and Calvin Whipple became owners of the land, and of all water-rights then appurtenant and belonging to the land on the west side of the river.

July 18, 1843, Joseph Parker, James Parker, and Calvin Whipple conveyed one undivided half of the "mill privilege," spoken of above (being a narrow strip of land on the west side of the river, extending from seven rods above the dam down the river to the tannery plot, twenty rods below the dam, and containing one acre), to James Allen, with the following exception in favor of the tannery plot, "saving and reserving to ourselves the privilege of taking a sufficient quantity of water from the mill-dam and carrying it across said tract as it is now conveyed for grinding bark, carrying a fulling and rolling mill, pumping water and supplying the vats." And November 15, 1853, James Parker (he having in the meantime acquired the title of Joseph Parker and Calvin Whipple) conveyed the other undivided half of the same "mill privilege" to Wm. H. Cummings, excepting the same water-rights in favor of the tannery plot as were excepted in the deed from the two Parkers and Whipple to Allen, last above referred to, and in the same language.

The tannery plot has come to the defendants from Joseph Parker, James Parker, and Calvin Whipple in this way: (1) October 5, 1846, Joseph Parker and Calvin Whipple conveyed to James Parker "all our right and title to the tannery and starch factory plots situated," &c. (2) October 29, 1868, James Parker conveyed to the defendants and Ward Aldrich the "tannery buildings, premises and appurtenances connected with the same together with the water-power and flume belonging to the same." (3) It was conceded that the title and interest which Ward Aldrich took by the last deed is in the defendants.

As bearing upon the construction of the deeds, heirs of Hamlin Rand to Robert Rand, and Robert Rand to Joseph Parker, James Parker, and Calvin Whipple, with respect to the question whether those deeds did or did not convey any water-rights on the west side of the river as appurtenant to the acre called the mill-privilege, the plaintiffs introduced deeds in the chain of title to the aforesaid acre, going back to 1803, and commencing with a deed (1) from Obadiah Belknap to Jesse Young, dated January 15, 1803, in which the premises are described as follows: " Beginning at the north-easterly corner of the Belknap lot so called, west side of Ammonoosuc river opposite the said Young's mills; thence running twenty rods on the river bank to a bunch of white bushes marked J. G.; thence four rods on a high bank adjoining the meadow to a poplar tree marked B.; thence on a straight line to the northerly line of said lot; thence on said line fifteen rods to the bounds first mentioned and is to contain one full acre be the same more or less." (2) Deed of heirs of Jesse Young to James I. Swan, dated Aug. 22, 1808. This deed conveys " two certain tracts of land with the mills, mill-dam and waterfall of Ammonoosuc river appurtenant thereto" &c. " Also one acre of land on the west side of the river opposite to said mills, conveyed by Obadiah Belknap to our late father" &c. (3) Deed of Hamlin Rand to Orlando Kelsey of June 13, 1822 (hereinbefore referred to), in which occurs the following clause, " meaning hereby to convey one acre of land conveyed by James Young and others to said James I. Swan" &c. If these deeds or any others in the title of said acre are competent to be considered upon the true construction of the deeds of H. Rand's heirs to Robert Rand, and of Robert Rand to Joseph and James Parker and Whipple, or upon any other question of law presented by the foregoing statement, they are to be considered for such purpose, and may be referred to at length.

No evidence, from which the referee was asked to find any conclusion of fact, was introduced with respect to the drawing and use of water from the dam by the occupant of the " mill privilege," or any riparian owner on the west side, except the defendants, during the period covered by the writ or any part thereof.

The plaintiffs' contention upon the foregoing facts was, that the whole water-power of the river, and all right to use water for milling purposes at this dam and privilege, had, long before the date of the writ, become annexed to the grist-mill, saw-mill, and fulling-mill on Gookin's plot on the east side; and that their legal right was invaded whenever the defendants took any water from said dam for the use of their mill on the tannery plot. The contention of the defendants was, that one half the water-power and privilege at the dam, during the time covered by the writ, was appurtenant to the land on the west side, and that the plaintiffs' rights were not touched till more than one half the water was taken and used on that side.

The referee does not find that at any time during the period covered by the writ the defendants have taken from the dam more than one half the water flowing in the river, or that at any time during the same period more than half the water of the river was taken from the dam and used on the west side. If the contention of the plaintiffs, as above stated, should be sustained, they will be entitled to judgment for such damage as has been caused to them by any use of the water by the defendants for milling purposes on the west side. And the referee thinks that in such event a further hearing as to damages (unless the parties agree) may be necessary. If the contention of the defendants, as above stated, should be sustained, they will be entitled to judgment. If it should be held that the defendants' rights are measured and defined by the lease from H. Rand to J. Boynton, or by the exceptions in the deeds to James Allen and Wm. H. Cummings, and that the plaintiffs' rights have been invaded whenever, in the use of the water, the defendants have gone beyond their own right as thus limited, whether in so doing they have caused more than half the water in the river to be used on the west side or not, then the referee finds that the defendants are liable, and assesses the damages at $25.

In response to a special request from the plaintiffs, the referee finds,—Between 1850 and 1876, in times of low water when water was being used at the tannery plot, the occupants of the grist-mill occasionally requested the occupants of the tannery plot to shut down so as to give the grist-mill sufficient water to grind, and such requests were acceded to. But I do not find that the occupants of the tannery, in so shutting down at the request of the grist-mill, understood that they were acquiescing in or yielding to a claim of paramount right on the part of the grist-mill owners in more than one half the water of the river, or that they intended thereby to recognize or yield to such a claim. Also, the canal on the west side of the river, whereby water is taken from the dam for use on the defendants' premises, the tannery plot, was greatly enlarged and deepened, first in 1854, and again in 1858.

On a bill in equity, brought by the plaintiffs against the defendants, for an injunction against the alleged diversion of water from the plaintiffs' mill, the same facts were found by the same referee.

*E. D. Rand*, for the plaintiffs. The important question is, whether or not the words "and the mill privilege connected therewith" in the deed from the heirs of Hamlin Rand to Robert Rand, dated May 4, 1843, conveyed half the dam and half the water-fall of Ammonoosuc river at Lisbon village. We say they did not, for many reasons. The grantors in the deed had no such property to convey. This brings us to the construction of the deed from James I. Swan to Stephen H. Whiting, dated March 16, 1812. The defendants say that after making that deed, Swan owned one

half the dam and water-power as appurtenant to the acre on the west side of the river. The plaintiffs say that he owned nothing in the water-power and dam except the grist-mill privilege excepted or reserved in the deed. Which contention is right? The court will keep in mind that at the date of the deed not a drop of water was used on the west side of the river. The mills on the east side had been used for many years. The deed conveys to Whiting "all the canal water privilege" except the grist-mill and the Gookin privilege. Is it not absurd to say, that, after having made such a deed, Swan could have opened a canal on the west side of the river and drawn off half the river by means of this new canal? Would such an act, in times of low water, have left his previous grant to Whiting unimpaired? The deed conveys "a proportionate right in the main dam across the river." What does that mean? Among what rights is the proportion to be established? Whiting takes a portion of the main dam certainly by virtue of his deed. Swan keeps a portion for his grist-mill. Gookin gets a portion by virtue of a previous deed. All their rights are mentioned in the deed to Whiting. Is there another right, not alluded to in the deed, that draws to itself one half the dam, so that Whiting must go out of his deed to find what his proportion is, and learn that in fact he has not got a proportionate right in the main dam, but only in half of it? The deed says, "saving only to myself, heirs or assigns the grist or corn mill," to Gookin the plot and privileges conveyed to him by Ruby Young, and to the public the road over the bridge. Did Swan also save half the dam and river for the acre on the other side? *Expressio unius est exclusio alterius. Line v. Stephenson,* 5 Bing. N. C. 183; Br. Max. 505; *Pray v. Company,* 38 N. H. 442. The extent of the interest conveyed is made plain by reference. The description is "lot numbered one in the first and second ranges called the Mill lot, and the same conveyed to Israel Swan and myself by James Young and others as per their deed." Surely Whiting had the right to look at the deed from James Young and others to the Swans, if he had any doubt about his own deed. Now what does that deed say? It says,—"Two certain tracts of land with the mills, mill-dam and waterfall of Ammonoosuc river appurtenant thereto." Can human language express an idea more plainly? Is not the whole mill-dam and the whole waterfall annexed to the lot on the east side? But the deed says further, "also one acre of land on the west side of the river opposite to said mills, conveyed by Obediah Belknap to our late father." Not a drop of water or a foot of the dam is annexed to the acre on the west side by the deed from James Young and others to the Swans. And this acre is the nucleus around which the whole controversy gathers. Unless the sale of this acre carried half the dam and half the waterfall as appurtenant thereto, the defendants are left without the least vestige of defence. But assuming that there may be doubt about the con-

struction of the deed from Swan to Whiting, then we say that "all doubtful expressions in deeds between individuals are to be construed favorably to the grantee." Mor. Dig. 252.

The defendants claim that the words in the deed from the heirs of Hamlin Rand to Robert Rand, "and the mill privilege connected therewith," simply by the force of the doctrine of *filum aquæ*, conveyed half the dam and waterfall. There is not a case to be found anywhere in which the doctrine has been applied to the construction of a deed conveying land abutting upon a mill-dam. We submit that such deeds invariably speak of the dam and waterfall, if the intention is to convey any portion thereof. The rule, that "where a grant is made extending to a river, the centre of the stream is the line of the boundary," is not a rigid, unyielding rule of construction. In all cases when there is an attempt to apply the rule, the real question is one of intention. *Rix* v. *Johnson*, 5 N. H. 522.

This acre on the west side of the river appears in a large number of deeds, and it is the same thing in all of them. July 23, 1831, Hamlin Rand bought it of Orlando Kelsea. The river boundary of it is thus described in the deed from Kelsea to Rand, "thence down said river by the mill dam and under the bridge about twenty rods below mill dam to a hole drilled in the rock at the edge of the water." This description excludes the river. The expression " by the mill dam" means by the end of the dam. It cannot possibly mean over the centre of the dam. Kelsea bought the acre by deed, dated June 13, 1822, of Rand, executor of James I. Swan. One deed refers to the other. Rand, acting as executor of Swan, perhaps supposed that there might be some water rights connected with this acre; and the defendants lay considerable stress upon this deed, claiming that it supports their theory of the case. But what Hamlin Rand did was, simply as executor of Swan, to sell the acre to Kelsea in 1822, with water enough to run a triphammer, and buy it back again in 1831, with the same water rights, in his individual capacity. Both deeds speak of the water-rights. But nothing in the deeds would indicate that the parties really understood that any water rights would pass simply as appurtenant to the acre, without being expressly mentioned in the deeds. On the contrary the deeds bear the opposite construction. Rand, for the sake of safety in his deed to Kelsea, reserves " all water privileges upon said premises." But nobody claims under this reservation. At most it was the mere expression of opinion of a man who was not a lawyer. *Pray* v. *Company*, 38 N. H. 442. And the proper construction is placed beyond question by considering together all the deeds which relate to this acre. There is an unbroken chain of reference from Kelsea's deed to Rand in 1831 to Obediah Belknap's deed to Jesse Young in 1808. The heirs of Hamlin Rand had nothing on the west side of the river but what they inherited from their father. He had nothing but what he bought of Orlando Kelsea. Kelsea had nothing but what

he bought of Rand, executor of Swan. Swan had nothing but what he bought of the heirs of Jesse Young. And Jesse Young had nothing but what he bought of Obediah Belknap. And Belknap sold the acre for ten dollars, and bounded it on the bank of the river. *Daniels* v. *Railroad*, 20 N. H. 85; *Child* v. *Starr*, 4 Hill 369; *Bradford* v. *Cressey*, 45 Me. 9, 13; *Halsey* v. *McCormick*, 13 N. Y. 296. It is true that Swan, when he owned on both sides of the river, might have annexed water rights to the west side. But that is precisely what he did not do. He annexed all the dam and water-power to the east side in his deed to Whiting. It is also true that Hamlin Rand might have annexed water rights to the acre on the west side when he owned on both sides. But he did nothing of the kind. In his deed to Morrison, April 5, 1824, he annexed the "mill-dam and waterfall appurtenant thereto" to the east side. On the same day he bought back from Morrison the grist-mill privilege. And, doubtless, he bought the trip-hammer privilege from Kelsea in 1831, because he feared that whatever was used on the west side would have to be carved out of the grist-mill privilege on the east side.

The lease from Hamlin Rand to Joseph Boynton, dated March 28, 1832, is the origin of the use of water on the west side of the river. And the use has been growing from year to year without right. The lease conveys exactly the same water rights as are reserved in the deeds of Joseph and James Parker and Calvin Whipple to James Allen in 1843, and in the deed of James Parker to W. H. Cummings in 1853. And it is conceded by the defendants that these are all the water rights which they now have or had at the date of the writ. The plaintiffs claim that the defendants have no water rights, because they pay no rent and disclaim to hold under the lease. It will be observed also that the lease is only of the waste water. It is made subject not only to the grist-mill, but to all the mills on the east side. Boynton was to use no water when it was "wanted for said mills." Hamlin Rand was clearly wrong in supposing he had the right to lease this waste water. But as nobody claims under the lease, the error is of no importance. He could have leased water on the west side, of course, to be taken out of the grist-mill privilege. If that was his idea, the lease was well enough.

After the expiration of the lease for one year of certain water rights, the Parkers and Whipple obtained from Robert Rand a bond for a deed. This bond was in the hands of the defendants' counsel at the time of the hearing before the referee. They refused to produce it. Why? The court will not be slow to infer that it was simply because the bond contained a clause in regard to water rights (probably the same water rights as were leased by Hamlin Rand), and was the only title that the Parkers and Whipple had to any water whatever, or that the defendants now have.

May 4, 1843, the heirs of Hamlin Rand conveyed to Robert

Rand the mill-privilege on the west side of the river. It was simply "a certain plot called the mill privilege," the acre, which appears in so many deeds. Did they intend to convey to Robert Rand one half the dam and waterfall as appurtenant to that plot? If not, the defendants have no case. On the same day Robert Rand conveyed to the heirs of Hamlin Rand "the grist-mill with all the land and privileges thereto belonging." Of course the parties to these two deeds could not impair in any way the privileges previously granted. There was the Gookin privilege and the Whiting privilege, entitled each to its share of water. The Ammonoosuc river is a short mountain stream, subject to great variations in its volume of water. A grist-mill privilege is a favored privilege—generally the first privilege on all mountain streams—because it is very important that a grist-mill should be able to accommodate the public at all stages of water. Now, is it not monstrous to suppose that the heirs of Hamlin Rand, at the very time they were taking a deed of this grist-mill privilege from Robert Rand, would carve out of it one half the river, to the utter ruin of their privilege except in times of very high water?

*Bingham & Mitchell,* for the defendants. This controversy is in respect to the respective rights and privileges of these parties to the water-privileges of the Ammonoosuc river at Lisbon village. The plaintiffs are owners of land and a mill upon the east side of the river, and the defendants' property is located directly opposite, upon the west side of the river. The question is, What are the rights of these parties respectively to these water rights and privileges? To ascertain the correct answer to this question, and to accurately define the rights of these parties, involves the consideration of two points, and only two, when the issue is reduced and limited to its legitimate compass, viz.: (1) What is the true westerly boundary of the land conveyed, and what the true and legitimate limit of the rights and privileges granted by the deed of James I. Swan to Stephen H. Whiting, which is dated March 16, 1812? (2) The second, and, as we regard it, the principal and most material inquiry is, What water rights and privileges were granted and received by and under the deed of Robert Rand to Joseph Parker, James Parker, and Calvin Whipple, which is dated May 5, 1843? On this conveyance the defendants' right to the use of the water is based. Back of it, or independent of it, they neither seek nor claim any right, and they admit of the existence of none except what emanates from it.

We will first direct our attention to, and ask the court's consideration of, the description contained in the Whiting deed, upon which so much reliance is placed by the plaintiffs. This is a conveyance of land upon the east side of the river, *i. e.,* upon the same side of the river on which the plaintiffs' property is located, and just below their property. It purports to be and is a conveyance

of land. The water rights and privileges granted by this deed are those only which are legally incident and appurtenant to the land conveyed. There were none granted in addition to or independent of those which were granted by the simple conveyance of the land. The only change wrought in those rights and privileges which were legally incident and appurtenant to the land conveyed, by the description in the deed, is to diminish them, deduct from them, and make reservations out of them. There are no additional rights granted, but there are material reservations of the rights, which without the reservations would be granted. A critical analysis of the description in the deed will demonstrate the correctness of our position. Let us first examine and see what the easterly and westerly boundaries of the land conveyed are. It is bounded east by the road, and consequently extends to the centre of the road. This rule has been long and well settled in this state. *Woodman* v. *Spencer*, 54 N. H. 507; *Goodeno* v. *Hutchinson*, 54 N. H. 159; *Reed's Petition*, 13 N. H. 381; *Nichols* v. *Suncook Mfg. Co.*, 34 N. H. 345; *Rix* v. *Johnson*, 5 N. H. 520; *Kimball* v. *Schoff*, 40 N. H. 190. It is bounded westerly by the river. The location of this boundary, the river not being navigable, is the middle or thread of the stream. See cases before cited; also, *Greenleaf* v. *Kilton*, 11 N. H. 530; *Claremont* v. *Carlton*, 2 N. H. 369; *State* v. *Gilmanton*, 9 N. H. 463; *Canal Com'rs* v. *People*, 5 Wend. 447; *Trustees of Kingston* v. *Louw*, 12 Johns. 252; *Ex parte Jennings*, 6 Cow. 536, and *n. a.* "Thence westerly on said north line of said lot to the mill-pond, thence southerly down the mill-pond to the canal, thence down the canal to the north-east corner part." The mill-pond and canal are the river. So its boundary upon the west is the river, and it extends as before observed to the centre of the river.

The clause "and all the canal water privilege and a proportionate right in the main dam across the river" contained in the deed, is simply an enumeration of the rights that would pass as incident to the land conveyed, and not a separate grant of any rights or privileges disconnected from those before granted. On this point the case of *Seavey* v. *Jones*, 43 N. H. 441, is directly in point and decisive. In this case the defendant conveyed to the plaintiff one undivided half of land and mills upon the west side of Warner river, "with a privilege of flowage, use of water and repairing of dam," and to hold the premises with the privileges and appurtenances to the same belonging. Seavey insisted that he had a right to use one half of all the water in the river, instead of one fourth; or, in other words, claimed the right to the whole stream by virtue of this clause, "with a privilege of flowage, use of water and repairing of dam." The court held that this clause did not warrant such a construction. *Sargent*, J., in delivering the opinion, said,— "There is simply an enumeration of the rights and privileges which were to pass by the deed as there was of the buildings on

the land, all of which would have passed as well without any such distinct enumeration as with it." To the same effect is *Thompson* v. *Banks*, 43 N. H. 540. Apply this rule to the clause " and all the canal water privilege and a proportionate right in the main dam across the river" in the Whiting deed, and we have simply an enumeration of the rights granted by the conveyance of the land which was bounded east by the road and west by the river. It neither enlarges nor diminishes the rights previously granted. "All the canal water privilege " must have reference, taking what precedes and follows it, to the canal water-privilege appurtenant to the easterly half of the stream, within the limits of the legal boundaries of the land conveyed. "A proportionate right in the main dam across the river " is and must mean " a just share " of the dam which belongs to the easterly side of the river ; the " grist or corn-mill," upon the same side, just above, and the " Gookins plot," on the same side, just below, to have the balance. The proportion was to be established between these three interests. A. proportion is an " equal or just share." Web. Dict. This clause was really anticipating reservations which were and are made further on in the deed.

The rights and privileges granted, being limited to the rights and privileges incident and appurtenant to the land bounded, the reservations are rights and privileges carved out of the rights and privileges incident and appurtenant to the land bounded. The reservations are two in number. First, " reserving . . . the exclusive right of the grist or corn-mill with two sets of stones, and to draw water from said canal sufficient to supply the same." Second, " saving . . . to Richard Gookins all the plot and privileges conveyed to him." Then, to make it doubly certain what is intended, and as a limitation upon the land conveyed and rights granted, the grantor adds, " hereby intending to convey all that plot and mill privilege situated west of the road and east of the river extending from the oak tree by the lines aforesaid to the north line of the mill lot," and again enumerates the reservations to which we have before referred. Here is a plain, distinct boundary of land, giving its north, south, east, and west boundary, and expressly stating that this piece of land is what he intends to convey, and expressly makes the reservations from this land. This clause in the deed defines and restricts the land conveyed and the rights and privileges granted, and it must prevail and govern ; the general, indefinite description must be rejected in determining the correct construction of the deed. *Tenny* v. *Beard*, 5 N. H. 58 ; *Barnard* v. *Martin*, 5 N. H. 536 ; *Flagg* v. *Bean*, 25 N. H. 49 ; *Woodman* v. *Lane*, 7 N. H. 241 ; *Bell* v. *Sawyer*, 32 N. H. 72 ; *Nutting* v. *Herbert*, 35 N. H. 120 ; *Bailey* v. *White*, 41 N. H. 337 ; *Peaslee* v. *Gee*, 19 N. H. 278. This is a well settled rule of construction in this state, and its application to the construction of the Whiting deed demonstrates, we respectfully submit, in terms

which leave no grounds for doubt, that by this deed nothing is granted outside the limits of the land bounded, and consequently no rights or privileges upon the west side of the river are by it granted or in any way interfered with.

What water rights or privileges were granted by and received under the deed of Robert Rand to Joseph Parker, James Parker, and Calvin Whipple, dated May 5, 1843? Under or by virtue of the lease of March 28, 1832, from Hamlin Rand to Joseph Boynton, the defendants claim no right whatever; so that may at once be eliminated from the questions in this case to be considered, so far as the defendants are concerned. The bond for a deed given by Robert Rand to Parkers and Whipple was not material to any question in issue between the parties before the referee. It was simply an obligation to do that which the obligor afterwards did, presumptively in exact accordance with it. Whether it was in accordance with the terms of the bond or not is entirely immaterial so far as these plaintiffs are concerned. This document we think should also be rejected from the consideration of the questions legitimately bearing upon the issue to be settled in this case. The defendants' claim and position is well put by the referee, and is, in substance, that the west side of the river is entitled to half the water in the river as appurtenant to the land upon that side. If their claim is sustained, that puts an end to this whole controversy, Stephen H. Whiting took by his deed of March 16, 1812, no right which was appurtenant to the west side of the river. This we think has been satisfactorily demonstrated. Swan died April, 1820, seized of the land upon the west side of the river, with all of its appurtenances, none of them having previously been conveyed, disannexed, or in any way disposed of. Hamlin Rand owned and was seized of the same land and rights July 23, 1831. In 1836, when he died, Hamlin Rand was seized of these same rights. When Hamlin Rand died, he and his brother Robert Rand were in fact tenants in common of this land and those rights, although the legal title was in Hamlin Rand. This common ownership and right was recognized by the heirs of Hamlin Rand, May 4, 1843. On that day Robert Rand became the absolute owner of this land and those rights by a deed from the heirs of Hamlin Rand, they describing the land in which the defendants are interested in this way, viz., "also the tannery land and buildings thereunto belonging, and the mill privilege connected therewith." May 5, 1843, Robert Rand conveyed to the parties under whom these defendants claim the "mill privilege," which was conveyed to him May 4, 1843, by the heirs of his brother Hamlin. This "plot" is bounded east by the river. The boundary upon the river is as follows, "thence down the river to the north-east corner of the tannery plot." Being bounded by the river, it goes to the centre of the stream. See authorities before cited. Thus, on May 5, 1843, the Parkers and Whipple, from whom the defendants' title comes,

became owners of the land and all the water rights that ever were appurtenant to the land upon the west side of the river. And this being so, the plaintiffs have no cause of complaint unless the defendants have used more than the share of water which belongs to the west side of the river, viz., one half of the water of the river. And less than half the water having been used, as found by the referee, the plaintiffs have no cause of complaint, and there should be judgment for the defendants both in the suit at law and the bill in equity.

In addition to the other questions here presented, there arises the question of the estoppel of these plaintiffs, in setting up the claim which they here insist upon. Two of these plaintiffs, Judge Rand and Mrs. William H. Cummings, are two of the heirs of Hamlin Rand, who conveyed the " tannery plot " and " mill privilege " to Robert Rand in May, 1843 ; and the other plaintiff, William H. Cummings, claims under these same heirs who made that conveyance. By that conveyance they are estopped and concluded, and by and upon it they must stand. They cannot claim that they did not convey what the deed upon its face shows they did. With the superior rights possessed by the owner of the plot under the Whiting deed, even if any exist, they have no concern. The question is, What did they convey ? " The tannery land . . . and the mill privilege." This is a conveyance of a mill-privilege, the existence of which they now deny. What did they mean by mill-privilege ? They meant exactly what Robert Rand conveyed to the Parkers and Whipple the next day by particular boundaries. So the referee finds. About this we maintain there can exist no doubt. If there exists a doubt as to what was intended by them, and as to the true construction of their deed on this point, then there must be applied that equitable and long established rule of construction, that " all doubtful expressions in deeds between individuals are to be construed favorably to the grantee." *Cocheco Mfg. Co.* v. *Whittier*, 10 N. H. 305 ; *Leavitt* v. *Towle*, 8 N. H. 96 ; *Darling* v. *Crowell*, 6 N. H. 421, 424. They make no reservations whatever in the deed in favor of the east side of the river. None can be implied. A reservation or exception " must be by apt words." *Upham*, J., in *Darling* v. *Crowell*, *supra*. In the deed they get, no rights upon the west side of the river are granted. They get simply " the grist mill with all the land and privileges thereto belonging." How is it possible to get the westerly boundary of this land beyond the middle of the stream ? The plaintiffs have no rights whatever west of the centre of the river, and consequently none of their rights have been disturbed.

*G. A. Bingham* and *E. Aldrich*, for the defendants. The plaintiffs, being the heirs of Hamlin Rand, or their privies, are estopped from maintaining this action by their deed of May 4, 1843, regardless of the Whiting deed. James I. Swan died seized of all land

on both sides of the river, the title to which bears upon the present·
controversy, except the saw-mill (which the plaintiffs do not own).
July 23, 1831, Hamlin Rand had all the title that Swan had at his
death.   Rand died seized, in 1836, of all those rights.   Robert
Rand was, in equity, tenant in common with Hamlin, in the right
in controversy; and his heirs (these plaintiffs) and Robert, May
4, 1843, made a division of their undivided lands, and especially of
the lands and rights on the two sides of the river, the heirs con-
veying to Robert the tannery land and mill-privilege on the west
side, and Robert conveying to them the grist-mill, land, and privi-
leges on the east.   The defendants hold the title of Robert Rand.
This makes these parties owners on opposite sides of the river,
on the same waterfall, each deriving title from the same source,
and on a division between two tenants in common; and the ques-
tion is, Where, under their deeds, is the division line between
them?   It is clear from the case, considered in connection with
the deeds, that the intention of the parties was to make partition
of the lands, of which Hamlin Rand died seized, in which Robert
was, in equity, a tenant in common.   The deeds were executed at
the same time, respecting the same subject-matter, and formed but
one instrument.   The heirs of Hamlin conveyed to Robert "the
tannery land and buildings thereto belonging, and the mill privi-
lege connected therewith."   This was a conveyance of land, to
wit, the tannery plot and the mill-privilege connected with it,
which the case finds to be a parcel of land with definite bound-
aries, the westerly being the river.   The conveyance then to Rob-
ert was of land from a point on the west side of the river, seven
rods above the dam, down the river to the north-east corner of the
tannery plot, and as much further down the river as the length of
the east line of that plot.   It was of two plots of land, the tannery
plot and the mill-privilege plot adjoining it or connected with it,
and both bounded easterly by the river.   The conveyance of Rob-
ert to the heirs of Hamlin was of "the grist-mill with all the land
and privileges thereto belonging," which is situated on the east
side of the river.   The plaintiffs now own the grist-mill, and sue
for damages to it, under the Robert Rand deed.   The defendants
have the title that came to Robert from Hamlin Rand's heirs.   It
is entirely immaterial how the title came in Hamlin Rand, or
Hamlin and Robert as tenants in common.   All the necessities of
the case are met when it appears that Robert Rand and the heirs
of Hamlin agreed that they were tenants in common, and divided
on that basis.   The dividing line made by their deeds is the line
between these parties, neither having acquired additional rights.

What was that line?   In *King* v. *King*, 7 Mass. 496, 499, a
case, in its facts similar to and in principle identical with this, it is
said by the court that "the legal operation of this partition and
assignment is, that the falls and bed of the river, and the water-
privileges, were alike divided and assigned, as parcels of the two

tracts, which after the partition were to be considered as separated, so far as they lie opposite to each other upon the river, by a central line, or the thread of the river as it is sometimes called." The principle of this case is the uniform one, in this state, that when a boundary is a river, the centre, or thread of it, is the line. This is also true in case of a mill or artificial pond on a river. *Phinney* v. *Watts*, 9 Gray 269; *Lowell* v. *Robinson*, 16 Me. 357; *State* v. *Gilmanton*, 9 N. H. 461. At the time of the partition between Robert and the heirs of Hamlin, the title to both sides of the river was in them, and there could be no use in favor of one side upon the other that would create an easement. *Murphy* v. *Welch*, 128 Mass. 489. The deeds of Robert and the heirs being in law one instrument, their mutual releases were simultaneous in their operation; and no easement was created in favor of one side, or mill-privilege, more than the other. Each took his side, with the water right incident to it. But it is said by the plaintiffs, that though the referee has found that Hamlin Rand had all of Swan's title, July 23, 1831, and at his death in 1836, still that this is not sustained by the statement of the title, and that only the trip-hammer privilege was in him. Whether the error is in the finding, or in the statement of the title, is not important, as the legal effect of the deeds of partition of May 4, 1843, in either case, must be the same in this action. The deed of the heirs assumes to convey the two plots of land, the tannery and the mill-privilege plots, with the appurtenances which convey the water rights appurtenant to the west side. This gave Robert all the rights that Hamlin's heirs had, and estops them from saying that they have no title. They cannot be heard to say that their deed was a fraud, and that they have rights notwithstanding it.

But the plaintiffs further claim, that if they have no right in the water on the west side, the defendants have none except the trip-hammer privilege. This is not true, as shown above; but if it were, it does not aid the plaintiffs in maintaining this action. They have had their half of the water, and if the defendants have used the water belonging to the estate of Swan, the plaintiffs are not harmed. If they are entitled to only the water rights appurtenant to the east side, the defendants should have judgment.

The Whiting deed has very little, if anything, to do with the rights of these parties. If the plaintiffs ever had rights under it, they were common to both Robert and Hamlin Rand, and were readjusted and divided by the partition of May 4, 1843. The plaintiffs are not to-day the owners of any rights in the west side of the river that were created by Whiting's deed; and if any other person claims to be, it will be time to argue that case when it is presented. The defendants' construction of that deed is, that it was a conveyance of land on the east side by named bounds, with the water rights appurtenant to that side; and that this intention is stated in the description in the words "hereby intending to

convey all that plot and mill privilege situated west of the road and east of the river," which is another description of the land with the mill-privilege appurtenant to it. It does not convey a mill in terms, but land on the east side, and the mill-privilege belonging or appurtenant to it. On either side of a river at a waterfall, the land has, *prima facie,* appurtenant to it, the water rights to the thread of the stream; and a conveyance of the land, with the river as a boundary, would convey those rights without special mention, and a special mention of the mill-privilege on that side, locating it, would convey no more. It would be simply an enumeration of the rights and privileges that were to pass by the deed. *Seavey* v. *Jones,* 43 N. H. 442.

The Whiting deed conveyed land on the east side by metes and bounds, the westerly boundary being the river. It contains two descriptions, either of which is complete in itself. The land described is the same, without question, in each; and in both, the description is by metes and bounds, though the language is different. In each description there is a special enumeration of incidental rights. In the first, the enumeration " all the canal water privilege" is the one on which the plaintiffs rely, as showing that all the water of the river, if required to fill the canal, was conveyed and reserved. Now this depends upon what was conveyed by the description of the land by metes and bounds. If the entire waterpower of the river on both sides was conveyed by it, then the words " all the canal privilege" meant that; but if it conveyed only the water or mill-privilege incident to the east side, then it conveyed all the water-privilege incident to that side, and no more. Then, is there doubt as to what was conveyed? We think not, when the land conveyed was on the east side, and none of it on the west; when in the first description is added " a proportionate right in the main dam across the river" (if it conveyed all the water right, why did it not convey all the dam?); when in the second description the water-privilege enumerated is connected with the land, and so located by the express words of the deed, to wit, " hereby intending to convey all that plot and mill-privilege situated west of the road and east of the river." Here were two mill-privileges on this waterfall,—one on the east side and one on the west; and the grantor states, as plainly as language can well do, that it is his intention to convey that one between the road and the river, on the east side, and not the one on the west.

*A. P. Carpenter,* for the plaintiffs. Both parties claim under James I. Swan, who, on the 16th day of March, 1812, was seized of all the lands upon both sides of the river and of all the water rights which are the subject of the present controversy. There were then no mills of any kind, nor had there ever been any upon the westerly side of the river, and no water-power was then in use or had ever been used upon that side. Upon the easterly side

there were then, and long had been, three mills, namely, the saw-mill, grist-mill, and cloth-mill (Gookin's), and no others.   These mills were all run by water taken from the canal.   By his deed of that date, March 16, 1812, Swan conveyed to Whiting a tract of land (whereon was the saw-mill), particularly describing it by metes and bounds, and then continuing as follows, "together with the said mill  .  .  .   and *all the canal water privilege*, and a proportionate right in the main dam across the river, saving excepting and reserving to myself, heirs and assigns forever the exclusive right of the grist or corn mill with two sets of stones, and to draw water from said canal sufficient to supply the same in preference of any and all other machinery whatever,  .  .  .   hereby intending to convey all that plot and mill privilege situated west of the road and east of the river, saving only to myself, heirs and assigns the grist or corn mill exclusively, with its privileges as aforesaid, and to Richard Gookin all the plot and privileges conveyed to him by Ruby Young."   Whatever water-rights or water-power the defendants have, if any, must necessarily come from what were left in Swan after his deed; hence the importance of determining what water-rights passed to Whiting under that deed, and what did not pass.   My position is, that, subject to the exceptions named, Whiting took the whole canal water-privilege; that is to say, the right to take and use at all times all the water which would flow or which could be drawn through the canal as it then existed in connection with the main dam.   And for the purposes of this discussion only (by no means waving the point made by my associate upon the effect of the reference in the deed in question to prior deeds), it is conceded that there remained in Swan, besides his expressly reserved rights, the right to whatever water at any time would not flow through, or could not be drawn through, the canal; that is to say, all that water which at any time would flow over the dam or run to waste.

1.  What rights did Whiting take in "the canal water privilege?"

2.  What was the canal water-privilege, and what was the extent of it?   Was it a privilege of taking one half only of the water of the pond and river, or was it a privilege of drawing water to its full capacity from the whole body of the water of the pond and river, just as the canal was drawing the water at the date of the deed, and as it had always before that time drawn it?

I.  Upon the language of the deed it is clear that Whiting took "*all* the canal water privilege," whatever that was, subject, of course, to the exceptions named.   Such is the express language of the deed, "all the canal water privilege."   It is impossible to find words more explicit, and there is not a syllable to be found anywhere in the deed limiting or modifying the force of that expression in the slightest degree.   The clause "hereby intending to convey," etc., was inserted *ex majore cautela*, not to qualify the preceding language, but to make it more explicit and certain by

expressing the same idea in different words. "All that plot" is the tract of land before described, and so likewise "all that mill privilege" (the words "all that" grammatically qualify "mill privilege" as well as "plot"), means "all the canal water privilege." The use of the term water-privilege in its connection, immediately following the words "said mill," is not perhaps wholly without significance, as being a somewhat larger term than mill-privilege, although the two expressions are used in the deed as synonymous. If the latter might be construed to mean the privilege of using water for that mill only, the former cannot, certainly not without wresting the words out of their natural and more obvious meaning. The tract of land conveyed was much larger than was required for the purposes of the saw-mill; upon it other mills might be, in fact since have been, erected. What is there in this deed to indicate that the building of such other mills by Whiting was not contemplated by both parties? that Swan did not sell and Whiting buy "all the canal water privilege" for that very purpose? It is matter of history that Swan was a lawyer, and one of the most distinguished of his day. He knew the force and meaning of the words he used. If he intended to convey to Whiting the right to take from the canal only water enough to run the saw-mill, would he not more naturally have said so? Is it conceivable that by the expressions "all the canal water privilege" and "all that mill privilege situated west of the road and east of the river," he intended to describe, and understood that he did describe, the saw-mill privilege only?

The question is not upon the boundaries of the land conveyed, but upon the extent of the water rights granted; and the authorities cited by the defendants are not relevant. The expression "all the canal water privilege" is not "general and indefinite," but specific, definite, and certain: clearly no more particular and definite description of the water-rights intended to be conveyed is to be found in the deed. The subsequent words "mill privilege" standing alone are less explicit, though, qualified as they grammatically are by the words "all that," they are perhaps equally explicit. The word "all," as here used, is entitled to its natural and proper significance, and is of great importance. It expressly and effectually excludes the idea that a part only of the canal water-privilege was intended to be conveyed. "Where the principal description purports to be of all or the whole of any property described, any additional description apparently designed to apply to the same property, but which proves to be only partially true, will not be construed to restrict the grant, but all will pass." *Drew v. Drew,* 28 N. H. 512, 513, and cases there cited. If, then, the expression "mill privilege" be not qualified by "all that," and if it is narrower in its signification than "all the canal water privilege," the grant is not thereby restricted, but "all the canal water privilege" passes by the deed. Swan's deed contains full covenants of

warranty, and the exception "to Richard Gookin of all the plot and privileges conveyed to him by Ruby Young" was inserted to protect him from liability upon those covenants. There is no other imaginable reason for making that exception. But there was no occasion for it for that purpose, or for any purpose, if the deed conveyed no water rights except such as would have passed by a conveyance of the saw-mill *eo nomine*, nor unless the deed did in fact convey all the canal water-privilege except what was expressly excepted. It is to be observed that the land conveyed by Young to Gookin is not covered by the description of the land in Swan's deed, as a reference to the deeds will show, but the water-power so conveyed to Gookin was a part of the canal water-privilege. It is impossible, therefore, to account for Swan's making this exception or reservation except upon the theory that he at least understood that he was conveying all the canal water-privilege subject to the exceptions named. In short, the argument is simply overwhelming, that, subject to the express exceptions, all the canal water-privilege, whatever it was, vested in Whiting.

II. What is the extent of the canal water-privilege? Were its owners entitled to draw through the canal one half, the easterly half only, of the waters of the river, or all the waters of the river to the full extent of the capacity of the canal? Swan owning the bed and both sides of the river, the water was, in law, no more appurtenant to one side than to the other, in fact, was appurtenant to neither side, but a part of the land. Co. Litt. 4. By Swan's deed of any portion of the bed of the river, the water over it would pass, not as appurtenant to, but as a part of, it;—by his deed of land only, bounded on the margin of the river, no water would pass; by his deed of a mill *eo nomine*, water rights would pass, not as appurtenant, but under an implied grant, as being necessary to its proper use and enjoyment. No one can have any right in his own land distinct from his title to the land itself. Co. Lit. 121 *b; Whalley* v. *Thompson*, 1 B. & P. 371; *Barlow* v. *Rhodes*, 1 Cr. & M. 439; *Harris* v. *Elliott*, 10 Pet. 54. There is not the slightest ground for an inference that by the expression "and a proportionate right in [not part of] the main dam across the river," the intention was to convey no more than a just share in the dam as appurtenant to the land and mill; on the contrary, such inference is utterly inconsistent with the words of the deed. The language is not "land and mill and a proportionate right in the dam," but "all the canal water privilege and a proportionate right in the dam." Proportionate to what? Plainly to the interest which Whiting took in the whole waters of the river enclosed by the dam, precisely as was his obligation to maintain and repair the dam under the statute of June 16, 1801. Laws of 1805, 340. The clause has in fact no bearing whatever upon the question at issue, namely, What rights in the water did Whiting take under the deed?—because the latter must be determined before the for-

mer can be interpreted; in other words, the clause must be con-
strued in reference to the interest conveyed in the waters. Ac-
cording as Whiting took a right to water enough to carry the saw-
mill, all the canal water-privilege, whatever that was,—one half,
three quarters, or any other fraction of the whole water-power
created by the dam,—so was his proportionate right in the dam.
The clause admits of no other construction. The case finds that
the whole of the dam was then (at the time of the deed), as well
as ever before, subservient to the canal water-privilege, was used
for and was useful for that alone, certainly to the extent of the
capacity of the canal. The whole water-power consisted, then, of
the canal water-privilege, and of the surplus, if any, beyond the
canal's capacity, and was all created by the dam. Whiting had
just as much interest in the maintenance of the dam as he had in
the water-power thereby created, and no more. To put it math-
ematically : As the whole water-power created by the dam (Whit-
ing's and Gookin's rights, Swan's reserved rights, and his right in
the surplus or to the westerly half) is to Whiting's right, so is the
whole main dam to Whiting's interest therein. A right to the
surplus, as for argument's sake I concede, and the whole westerly
half of the river, as the defendants claim, remained in Swan; and
in either case he (Swan) had a proportionate right in the main
dam. Would not Swan have said a proportionate right in one half
or in the easterly half of the main dam, if he meant so?

But suppose a strict construction would enable Whiting to draw
off all the water of the river to the entire prohibition of any use
of it on the west side : what has that to do with the question?
Swan had a right to sell all he owned. Whiting had a right to
buy. The consideration paid is not stated. There is nothing to
show that Swan did not receive the full value of all the water-
power he owned.

There is no ground for the position that the clause "and all the
canal water privilege" and a proportionate right in the main dam
across the river is a mere enumeration of the rights that would
pass as incident to the land conveyed, and not a separate, indepen-
dent grant of rights or privileges disconnected from those before
granted. No water rights would pass with the land as such, it
being bounded upon the margin of the river. *Thompson* v. *Banks*,
43 N. H. 540, has no relevancy. The only question in that case
was upon the meaning of the word "about" in the expression
"privilege of laying logs, &c., on or about said privilege." In
*Seavey* v. *Jones*, 43 N. H. 441, lands and mills were conveyed
"with a privilege of flowage, use of water and repairing of dam;"
and the words in quotation were held to be a mere enumeration of
rights which would have passed as well without such enumeration.
The doctrine of that case has no application to this case. "A priv-
ilege of flowage and use of water" is in itself entirely indefinite
and uncertain; the extent of it can in no way be determined

except as connected with the mills conveyed, as being the privilege of flowage, etc., to the mills belonging. It is simply the common case of a conveyance of mills with the mill-privilege, right of flowage, etc., thereunto belonging. As a separate, independent grant, it would be void for uncertainty. Here, on the other hand, the privilege conveyed is defined and limited in itself, without reference to any other part of the deed; can be ascertained and measured with as much certainty and accuracy as if the words had been "together with the right to draw from the canal, under a head of ten feet, one hundred square inches of water," or any other defined quantity.

But let us assume for a moment that this position of the defendants is a sound one, and see where we land. If Swan had conveyed to Whiting the land and mill without any express mention of water rights or privileges, then it is clear that, as against Swan and all claiming under him, Whiting would have taken a right to sufficient water to run the saw-mill at all times when enough there was in the canal, or in the river upon either side, and that if Swan, or anybody claiming under him, afterwards erected other mills upon either side of the river, and there was at any time insufficient water for all of them, Whiting would be first entitled to water enough to run his saw-mill, and the other mills to the remainder only; and if there was at any time only water sufficient to run the saw-mill, Whiting would be entitled to the whole. This is clear upon general and elementary principles and upon the authorities. *Dunklee* v. *Railroad*, 24 N. H. 495, 496; *Gibson* v. *Brockway*, 8 N. H. 465; *Crittenden* v. *Field*, 8 Gray 621; *Hapgood* v. *Brown*, 102 Mass. 451; *Le Roy* v. *Platt*, 4 Paige 77; *Hathorn* v. *Stinson*, 10 Me 224, 233–236; *Strickler* v. *Todd*, 10 Serg. & R. 63. Suppose there were no mills there except the saw-mill, and that the whole water-power was only sufficient to run it: no one probably would contend that after the grant Swan could erect another mill on the westerly side, and lawfully take for its use one half or any part of the water; and if he could not do that, it necessarily follows that in case the water-power were generally much greater than the saw-mill required, he could in no event take more than the surplus. This point is deemed important, and to it the attention of the court is specially invited, because if well taken it must substantially dispose of the case; for the defendants have not as yet claimed, so far as I have heard, that Whiting took any less water rights by virtue of the clauses in the deed which we are considering than he would have taken without them. It is to be borne in mind that except in dry times there is sufficient water for all the mills on both sides of the river. The real question is, What are the respective rights of the parties when the water is low and insufficient for all? Which party, if either, then has the preference? It is to be noted, also, that the plaintiffs' right is by the express terms of the deed superior to Whiting's.

But there is not a word in the deed indicating that the expressions "all the canal water privilege" and "all that mill privilege situated west of the road and east of the river" were used to signify the privilege of drawing the water of the easterly half of the river only, or that Swan so understood it. "Mill privilege" is here used as synonymous with "canal water privilege." The phrase "situated west of the road and east of the river" defines the *locus*, not the extent, of the privilege. Here, again, the inquiry is pertinent. If the intent was to convey one half only of the water of the river, would not Swan either have said "all the canal water privilege in and to the easterly half of the river," or have reserved, in connection with his other extremely cautious and careful reservations, "also the westerly half of the river"? It is in the highest degree improbable, if not inconceivable, that Swan, a lawyer, who knew that his deed would be construed upon "the supposition that he omitted nothing beneficial to himself which was agreed upon" (102 Mass. 454), and that doubtful terms would be construed most strongly against him, should have expressed himself as he in fact did, if he intended to restrict the canal water-privilege as then and for a long time before used, occupied, and enjoyed, to a privilege to draw the easterly half of the water only.

Every man is presumed to know the law. Swan, in fact, did know it. He must have been familiar with the doctrine then for more than three hundred years perfectly well settled, that "every deed conveys the property described in its existing state, that is, as it usually and rightfully is at the time of the execution of the conveyance. Such deed is to be construed in all its parts with reference to the actual, rightful state of the property conveyed at the time of the conveyance, unless some other time is expressly referred to." *Dunklee* v. *Railroad*, 24 N. H. 489, and cases cited; *Simmons* v. *Cloonan*, 47 N. Y. 3—*S. C.*, 81 N. Y. 557. "As the owner of property by virtue of his ownership has the right to make any disposition of it which he pleases, it seems to follow that if he does make any change in the property, those who claim under him and derive their title from him must take the property in the state it is in at the time precisely as if it had been its natural state and no other had ever existed. . . . All the authorities to which we have referred support the rule of the civil code, that 'If the proprietor of two estates [here the two sides, or, rather, the two halves of the river], between which there exist the apparent marks of a servitude, dispose of one of the estates without his conveyance containing any stipulation or reservation relative to the servitude, it continues to exist actively or passively in favor of the estate sold, or upon that estate.'" *Dunklee* v. *Railroad*, *supra*, 506, 507. An application of the language of that case to the facts in this case will read as follows: "A conveyance of 'all the canal water privilege' carries with it as incident thereto [to wit, a part or parcel of it, as I take it] the right to raise the pond and flow the lands

above as high as the same have been usually kept and flowed, to maintain the dam, flume, and canal as may be necessary to support the water at that height, to support and use the aqueducts and channels, and all other things necessary to convey the water to the canal, to use and enjoy all the water in the canal in the manner in which they have been kept up, used, and enjoyed immediately previous to the conveyance, so far at least as the grantor has the right to convey such privileges." *Dunklee* v. *Railroad,* 495, 496, and cases cited.

Perhaps there is no case which better exemplifies the rule, or in which the doctrine is more elaborately considered and better stated, than *Lampman* v. *Milks,* 21 N. Y. 505. In that case one C, owning forty acres, whereof a half acre was flowed by a brook running through the tract, by an artificial channel diverted the stream so that it no longer flowed the half acre, and then conveyed the half acre to the plaintiff, and subsequently the remainder of the tract to the defendant's grantor. The defendant dammed up the channel so as to cause the brook to run in its original channel and overflow the land of the plaintiff, who thereupon brought suit for the consequent damages. Both the lower courts gave judgment for the defendant, which was reversed by the court of appeals. The court, by *Selden*, J., say,—"It did not distinctly appear how long the stream had run in this artificial channel prior to the conveyance of the lot by C, nor do I deem this of any importance. The question is, whether after conveying this lot and its appurtenances to the plaintiff, with the stream then running in the artificial channel on to adjoining premises of his own, either he or his grantees would have a right afterwards to obstruct this channel and turn the water back through its original course across the entire lot. The owner of real estate has during his ownership entire dominion and control over its various natural qualities, and may dispose of and arrange them at will. He may alter the natural distribution of those qualities so as essentially to change the relative value of the different parts, and may in a great variety of ways make one portion of the premises subservient to another. The precise question in this case is, whether an owner, who by such an artificial arrangement of the material properties of his estate has added to the advantages and enhanced the value of one portion, can, after selling that portion with those advantages openly and visibly attached, break up the arrangement, and thus destroy or materially diminish the value of the portion sold. The rule of the common law on this subject is well settled. The principle is, that where the owner of two tenements sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the tenement or portion sold with all the benefits and burdens which appear at the time of the sale to belong to it, as between it and the property which the vendor retains. This is one of the recognized modes by which an easement or servitude is created. No

easement exists so long as there is a unity of ownership, because
the owner of the whole may at any time rearrange the qualities of
the several parts.    But the moment a severance occurs by the sale
of a part, the right of the owner to redistribute the properties of the
respective portions ceases, and easements or servitudes are created
corresponding to the benefits and burdens mutually existing at the
time of the sale.    This is not a rule for the benefit of purchasers
only, but is entirely reciprocal.    Hence, if instead of a benefit con-
ferred, a burden has been imposed upon the portion sold, the pur-
chaser, provided the marks of the burden are open and visible,
takes the property with the servitude upon it.    The parties are
presumed to contract in reference to the condition of the property
at the time of the sale, and neither has a right, by altering arrange-
ments then openly existing, to change materially the relative value
of the respective parts.    These principles, so obviously just,  . . .
are also sustained by ample authority."    The court cite at length
and comment upon the case of *Copie*, 11 Henry VII 25, *Nicholas* v.
*Chamberlain*, 2 Cro. 121, *Robbins* v. *Barnes*, Hob. 131, *Factory* v.
*Batchelder*, 3 N. H. 190, *United States* v. *Appleton*, 1 Sum. 492,
*Hazard* v. *Robinson*, 3 Mason 272, *Thayer* v. *Payne*, 2 Cush. 327,
and many cases relating to the obstruction of windows and to the
right of support from the adjoining soil.

The whole case in connection with *Dunklee* v. *Railroad* (which
is not cited, though decided eight years earlier) is most instructive
reading.    The one is the exact converse of the other.    The gran-
tee in the former case took the property conveyed with the then
subsisting benefits, and in the latter subject to the then subsisting
burden, while the principles enunciated in both cases are absolutely
identical.    The attention of the court is particularly invited to the
following cases cited in *Dunklee* v. *Railroad*,—*Cary* v. *Daniels*, 8
Met. 466, 481, 482, *Seibert* v. *Levan*, 8 Penn. St. 383, 387, *Tucker* v.
*Jewett*, 11 Conn. 311, *French* v. *Carhart*, 1 N. Y. 96, *Jewett*, C. J.,
104, *Gardner*, J., 109, *Johnson*, J., 112, *Kilgour* v. *Ashcom*, 5 H.
& J. 82; and to the following not there cited,—*Crittenden* v.
*Field*, 8 Gray 621, 626, 627, *Hapgood* v. *Brown*, 102 Mass. 451,
452, 453, *Richards* v. *Rose*, 9 Exch. 218, *Pyer* v. *Carter*, 1 H. & N.
916, *Glave* v. *Harding*, 3 H. & N. 937, *Story* v. *Odin*, 12 Mass.
157, *Hathorn* v. *Stinson*, 10 Me. 224, 233–238, in connection with
the third request for instructions to the jury, p. 228;—see, also,
*Mott* v. *Palmer*, 1 N. Y. 564.    In support of this doctrine, the
authorities from the earliest time to the present are all of one
accord.    They differ only upon the question whether the same
principle should be applied to a reservation or an exception.    The
weight of authority, however, sustains the proposition laid down
in *Dunklee* v. *Railroad*, that "property conveyed passes in its
existing state subject to all existing easements and burdens of a
similar nature in favor of other lands of the grantor which are
apparent, and result naturally from the relative situation of the

land, and from the nature, construction and intended use of the buildings, mills, &c., upon it, and their situation and connection with other property as they were usually enjoyed at the time of the conveyance." *Ibid* 496, and cases contra cited. But with this proposition we have here no concern. It serves merely to illustrate and enforce the general principle for which we contend, and need not be discussed.

The application of the principle of the foregoing cases to the facts in this case is plain and simple. All the waters of the river and pond were then and for a long time had been used and appropriated by Swan and his predecessors to feed the canal. No other use was then or ever had been made of any part of the water upon either side of the river. The servitude of the westerly half of the river—of the whole river—to the purposes of the canal, was open, visible, and continuous. It is immaterial whether the land conveyed to Whiting was bounded upon the easterly margin or by the middle of the river, or, indeed, if that were possible, by the westerly margin of the river. In either or in any case, whatever of the bed of the river was not conveyed was by the conveyance subjected to the servitude of the "canal water privilege" as it then was and theretofore had been used, occupied, and enjoyed. It is equally immaterial whether Swan, or any one to whom his estate came, subsequently conveyed the bed of the river, or any part of it, with or without warranty (21 N. H. 496), to any one under whom the defendants claim, because (1) such grantee could take only what was in his grantor; and (2) the servitude being open, visible, and continuous, the estate would pass subject thereto. This rule works equal and exact justice in this case, as indeed in all similar cases. Illustrations are without number, and no case can be put where the principle (differing in this respect from most general rules) would operate unjustly. In this case Whiting takes the water from the river and pond to the full capacity of the canal at all times. He is entitled to no more at any time. Whatever surplus there may be belongs to Swan to dispose of at his will. This construction is not only plain from the language of the deed, and supported by the authorities, but it is also in harmony with all the facts in the case. In truth, it explains simply and clearly that in the conduct of the parties which is otherwise wholly unaccountable.

It is therefore, I submit, certain that the defendants can in no event have any greater privilege than a right to take and use the surplus water, that is to say, the water which would not flow through and which could not be drawn through the canal, as it existed on the 16th day of March, 1812, because that was all the right which remained in Swan after his deed to Whiting. What may be the extent or quantity of that surplus does not appear in the case; it is a fact which remains to be found. Be it, however, more or less, and granting even that Swan's water rights, after his

deed to Whiting, were as extensive as can possibly be claimed, nevertheless it is absolutely certain that the defendants have no water rights except "the privilege of taking sufficient water from said mill-dam and pond to carry a trip-hammer." Swan died in April, 1820, seized of all the remaining water-privilege, leaving a will empowering his executor, Hamlin Rand, to sell and convey his real estate. This, so far as appears, gave Rand no interest in the estate, but a naked power only. *Dexter* v. *Sullivan*, 34 N. H. 478; *Gregg* v. *Currier*, 36 N. H. 200. June 13, 1822, Rand, executor of Swan, in the execution of said power, conveyed to Kelsea a tract of land on the west side of the river, and bounded easterly either by the margin or the middle of the river (it is immaterial which), "with the privilege of taking sufficient water from said mill-dam and pond to carry a trip hammer, saving, reserving and excepting to said Rand in his said capacity (as executor) all (other) water privileges upon said premises and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises, etc." It seems hardly necessary to remark that whether this deed conveyed the land to the margin or to the centre of the river, it is certain that the grantee took no water-power except the trip-hammer privilege. All the remaining water rights, whatever they were, became thereby severed from the land, and remained in the estate of Swan. Kelsea's grantee, though he might hold the land to the middle of the river, could take no water rights except the trip-hammer privilege; he could get no more than his grantor had. The reservations are immaterial. They show at most merely Rand's understanding that there might be water-privileges still belonging to Swan's estate; and such is, for the purposes of this discussion, the conceded fact, unless the trip-hammer privilege consumed the whole surplus. The right to take water to carry a trip-hammer may properly enough be termed a mill-privilege,—in fact, is a mill-privilege. The defendants claim, under the foregoing deed from Rand, executor, to Kelsea (and it is not pretended that they have any other claim), in the manner following: July 31, 1831, Kelsea conveyed to Rand individually that part of the land adjacent to the river, and also "all my right to any water privilege which the aforesaid deed of June 13, 1822 [the foregoing deed] may have given me." May 4, 1843, Rand's heirs conveyed to Robert Rand the tannery, &c., "and mill privilege connected therewith"—meaning by mill-privilege (as the case finds) the same premises conveyed by Kelsea to Rand July 31, 1831; and on the next day Robert Rand conveyed the same to Parkers and Whipple, through whom it came to the defendants.

But it is said that the plaintiffs, being the heirs-at-law of Hamlin Rand (though I do not see what that has to do with the question), and the makers of the deed of May 4, 1843, to Robert Rand, are estopped to deny the existence of the "mill privilege" which their deed purports to convey; and for the purposes of this argu-

ment this position of the defendants is conceded. It is conceded, also, for the same purpose, that they conveyed to Robert Rand exactly the same tract of land which he, the next day, May 5, 1843, conveyed to Parkers and Whipple; and further, for the same purpose and to gratify the defendants, who lay so much stress upon the point, I concede that the easterly boundary of the land so conveyed was the thread of the river. But these concessions do not aid the defendants; on the contrary, they are in entire harmony with my position. There is nothing in the deed to define or measure the extent of the mill-privilege, if the grantee took any mill-privilege that answers the call of the deed (*Pray* v. *Company*, 38 N. H. 442, 449, *Campbell* v. *Knights*, 24 Me. 332, Com. Dig., A 2, E 3); and he did take a mill-privilege, namely, the trip-hammer privilege, and no more. The deed of Robert Rand specifies no water rights; such, therefore, and such only, passed with the land as were appurtenant thereto, namely, the trip-hammer privilege, which, by the deed of Rand, executor, of June 13, 1822, was made legally and strictly appurtenant to that land. All other water rights being as before shown severed from this land, it is immaterial whether it goes to the centre of the river or not. It is not the land, but the right to the water, which is in question. Although, as I conceive, entirely immaterial, yet to avoid misconception I insist that the land conveyed by Kelsea to Rand, July 23, 1831, is bounded by the westerly margin, and not by the middle of the river. It is certain, therefore, that these defendants own no water rights other than the trip-hammer privilege. This proposition stands good regardless both of the construction of the deed to Whiting, and of the boundaries of the land. If, as the defendants claim, the westerly half of the waters of the river still remained in Swan after his deed to Whiting; if the land conveyed by Rand, executor, to Kelsea, June 13, 1822, the land conveyed by Kelsea to Rand individually, July 23, 1831, by Rand's heirs to Robert Rand, May 4, 1843, and by Robert Rand to Parkers and Whipple, May 5, 1843, is bounded by the thread of the river, nevertheless, that same half of the water, excepting only sufficient thereof to carry a trip-hammer, remains to-day in Swan's heirs, if any there be; and if not, it is vested in the state. *Montgomery* v. *Dorion*, 7 N. H. 475.

It is said, however, that these plaintiffs have no right to complain, and are entitled to no damages, if the defendants have been using water belonging to Swan's heirs or to the state; and this also is conceded. But I respectfully submit that the court will not give to the Whiting deed a construction which leaves so large a property as one half of the whole water-power undisposed of for so long a period,—leaves it in somebody who makes no claim to it,—leaves it, in fact, nobody can tell where, *in nubibus*, so to speak,—unless compelled to do so by the plain and unmistakable language of the instrument. It does not appear that Swan ever asserted

any claim to it in his lifetime. Rand, his executor, clothed only with a naked power to sell, during the whole remaining sixteen years of his lifetime never disposed of it; although, so far as appears in the case and as is the fact, he sold and conveyed all the rest of Swan's estate. This is, at the least, a strong circumstance tending to show that Rand did not understand that Swan died seized of so large and valuable a property in the power. On the other hand, Rand's conveyance of the trip-hammer privilege to Kelsea, his reservations in that deed, his lease to Boynton with its extremely cautious provisions superadded to a rental almost nominal,—in short, his whole conduct is consistent with the view that he understood Swan's right in the water to be what we say it was, namely, a right to the surplus water over and above the full capacity of the canal—a right of comparatively trifling value. Indeed, the remainder of that right, after the sale of the trip-hammer privilege, may have been, and probably was, of so little worth that no purchaser could be found for it.

In times of low water, that is, when there was no surplus, the defendants and their grantors shut down at the request of the plaintiffs. If this was a mere courtesy on the part of the defendants, it amounts to nothing; but if not, it shows that the parties took practically and contemporaneously the same view of their rights which, as I maintain, the law gives them. *Company* v. *Pendergast*, 24 N. H. 66, and cases cited.

It is not claimed that these considerations have a controlling weight upon the construction of the Whiting deed; but it is claimed that they are competent and proper to be considered thereupon, if its true construction is doubtful and uncertain. "Before fixing the construction of doubtful language, the court should look well to the consequences." *Bridge* v. *Railroad*, 17 Conn. 465. In construing any written instrument of doubtful construction, the court will place itself so far as may be in the place of the parties thereto, and to that end will hear and consider evidence of all the surrounding circumstances. 1 Gr. Ev., s. 287; *Goodhue* v. *Clark*, 37 N. H. 533, and cases cited; *Lane* v. *Thompson*, 43 N. H. 324. The positions taken by associate counsel for the plaintiffs are not waived or abandoned.

BLODGETT, J. May 4, 1843, the heirs of Hamlin Rand quitclaimed to Robert Rand "the tannery land and buildings thereunto belonging, and the mill privilege connected therewith," on the westerly side of the Ammonoosuc river, in Lisbon, and at the same time Robert quitclaimed to the heirs " the grist-mill with all the land and the privileges thereto belonging " on the easterly side of the river. The plaintiffs are the present owners of the grist-mill and its privileges, and the defendants of the tannery land and its privileges; and the issue between them is as to the priority and extent of their respective rights to the use of the waters of the

river. Primarily, therefore, the decision of this issue depends upon the construction of the conveyances between the Rand heirs and Robert Rand; but it being obvious, from the indefiniteness and uncertainty of the descriptive words used in those conveyances, that their extent can only be determined by extrinsic facts, it becomes necessary to consider the then existing circumstances and condition of the property and its rightful state, and also to trace the title under which the parties claim.

In 1812 James I. Swan owned the land and the water-power on both sides of the river which is now owned by these parties, and their titles are derived through him. At this time, as was conceded at the argument, there were not, and never had been, any mills on the westerly side; but on the easterly side there were then, and for years had been, three, namely, the saw-mill, grist-mill, and cloth-mill, all of which were run by water taken through a canal from a dam across the river at or near the site of the present dam. On March 16 of that year, Swan conveyed to one Whiting the tract of land on which the saw-mill was located, and, in connection therewith, "all the canal water privilege, and a proportionate right in the main dam across the river, saving, excepting and reserving to myself, heirs and assigns forever, the exclusive right of the grist or corn-mill, with two sets of stones, and to draw water from said canal sufficient to supply the same in preference of any and all other machinery whatever;" and reserving also "to Richard Gookin all the plot and privileges conveyed to him by Ruby Young." The defendants do not claim to be possessed of any of the rights thus acquired by Whiting. Whatever water rights they have must come from what were left in Swan after his conveyance to Whiting. It is therefore necessary to ascertain what water rights Whiting took by the conveyances, and what remained in Swan.

The general maxim of the law is, that the grant of a thing carries with it everything which is necessary to its reasonable enjoyment; and upon this principle there can be no doubt that, subject to the reservations of his deed, Whiting acquired the right to sufficient water to operate his saw-mill if it could be afforded by the canal water-privilege, and that to this extent the water rights remaining in Swan were correspondingly abridged and limited. Indeed, from the very nature of the property conveyed this would have been so even though there had been no mention of water rights or privileges.

But Whiting's rights were not thus limited by the necessities of his mill, or by its capacity. On the contrary, and subject only to the reservations, he took all the canal water-privilege, or, in other words, the entire privilege, and not a part of it. How, then, must this privilege be measured and its extent determined? Considering the natural signification of the expression "all the canal water privilege," in connection with the purpose for which the

canal was constructed and used, the capacity of the canal would seem to be the true measure of the privilege; that is to say, the privilege extended to all the water which could be drawn through the canal in connection with the then existing dam. If this be so, the right acquired by Whiting was the right to draw so much of the river as would flow through the canal; and its effect necessarily was to subject the entire river and its bed to the servitude of the canal privilege. Hence the conveyance, in 1822, by Swan's executor to Kelsea of the right to take sufficient water from the dam to operate a trip-hammer, was in legal effect simply a conveyance of so much of the surplus water as might be necessary for that purpose, and which might remain after the canal was supplied. It is true that the terms of the conveyance do not so limit it, and also that its reservations strongly tend to show that the executor supposed the water rights remaining in Swan after the Whiting deed were quite extensive: but these facts can have no weight because the executor could not convey nor Kelsea take any greater rights than those of which Swan died seized; and, moreover, the servitude of the river to the canal then was, and for many years had been, open, visible, and continuous, and consequently Kelsea would take subject to the servitude; for, when confined to cases of conveyances of mills or water-power, there is no difference of opinion or conflict of authority that the property conveyed passes subject to all existing, apparent, and necessary easements and servitudes.

The application of these principles to the partition deeds of May 4, 1843, is patent. Nevertheless it is strenuously urged by the defendants that because the deed to Robert Rand specifies a mill-privilege in connection with the other property conveyed, a mill-privilege passed to him, or if not, that the grantors and those claiming under them are estopped to deny it. If this were so its importance is not evident, because, "there being nothing in the deed defining or measuring the extent of the privilege, if the grantee took any mill-privilege the call of the deed is answered;" and water-mills being of so many different kinds, and used for so many different purposes, and requiring so different quantities of water, no reason is perceived why the trip-hammer right may not properly enough be regarded as a mill-privilege. But if not, it is quite immaterial, because the deed being one of quitclaim and release only, it neither conveyed the privilege nor any particular estate in it, but only the grantor's rights therein, which were to take sufficient water out of the surplus to carry a trip-hammer or its equivalent; and to this extent an estoppel arises, but no further. "A quitclaim deed only purports to release and quitclaim whatever interest the grantor possesses at the time. He does not thereby affirm the possession of any title, and he is not precluded from subsequently acquiring a valid title and attempting to enforce it. If he does not possess any title, none passes; and he may subsequently deny that any passed, without subjecting himself to any

imputation of a want of good faith."    *Field*, C. J., in *San Francisco*
v. *Lawton*, 18 Cal. 475, 476. And, apart from these considerations,
if the language of this deed is read, as it properly may be, in the
light of the circumstances and condition of the property, its actual
rightful state, and the object sought to be accomplished, the con-
clusion is irresistible that the parties mutually intended simply to
change the title and possession of the property conveyed; and
there is no applicable rule of legal construction by which the deed
may not so operate.

The effect of the partition of 1843 was therefore the same as in
the ordinary case of a partition between tenants in common, where
each party takes his estate with the rights, privileges, and inci-
dents inherently attached to it. Robert Rand took the water
rights attached to the trip-hammer privilege, and no more; and
the heirs those attached to the grist-mill privilege, and no more ;
and as against the plaintiffs the defendants' water rights must be
measured by those of Robert Rand, they can rightfully take no
more water from the dam than he could take, which was enough
of the surplus to carry a trip-hammer or its equivalent. On the
other hand, the rights of the plaintiffs are to be measured by those
of the heirs, which were, in respect of water, to draw sufficient
from the canal to supply the grist- or corn-mill with two sets of
stones, " in preference of any and all other machinery whatever."
It follows that the defendants have no water rights as against the
plaintiffs' mill. The contention of neither party before the referee
is sustained, but upon the facts reported by him the plaintiffs are
entitled to an assessment of their damages.

Doe, C. J. The deed, Swan to Whiting, conveyed to Whiting,
in 1812, the saw-mill and all the power of the river that could be
made available by the canal as it then was, except so much as
was necessary for carrying two sets of stones in Swan's grist-mill
and the Gookins cloth-mill, situated on the same canal. The canal
and the three mills were on the east side of the river. By the ex-
press terms of the deed, Swan retained, out of " the canal water
privilege," power for his grist-mill " with two sets of stones." He
also retained the surplus, if there was any, over and above " the
canal water privilege." Both of the parties in this suit claim under
Swan. Neither of them claims under Whiting. Both have no
more water power than was left in Swan after his deed to Whit-
ing. In 1820 Swan died, and the situation at that time was the
same as in 1812 after his deed to Whiting.

By his will, Swan authorized his executor to sell his real estate.
In 1822, Swan's executor conveyed to Kelsea an acre on the west
side, " with the privilege of taking sufficient water from said mill-
dam and pond to carry a trip-hammer." In 1824, Swan's executor
conveyed to Morrison, and at the same time Morrison conveyed to
Hamlin Rand, Swan's interest in the mill lot on the east side,

" with the grist-mill, mill-dam, and waterfall belonging to said lot." In 1831, Kelsea conveyed to Hamlin Rand the acre and trip-hammer privilege on the west side. After the death of Hamlin Rand, his brother Robert claimed one half of a large number of parcels of real estate, including the land and water rights on both sides of the river, of which Hamlin held the legal title at the time of his death. This claim was compromised and settled in 1843 by two deeds,—one from Hamlin's heirs to Robert of fourteen tracts, then standing in the name of Hamlin, among which were " the tannery land and buildings thereunto belonging, and the mill privilege connected therewith," on the west side of the river ; and another from Robert to Hamlin's heirs of a large number of tracts, then standing in the name of Hamlin, among which was " the grist-mill with all the land and privileges thereto belonging." The plaintiffs are to be regarded as the heirs who made the compromise with Robert. The defendants, claiming under Robert, contend that the legal title of half the power of the river passed to Robert by the conveyance to him of the property described in the deed as " the mill privilege." The tannery lot was twenty rods below the dam, and no part of the water-power belonged to that lot. The question is, What was the property described as " the mill privilege "? It was the acre described by the referee as " a narrow strip of land on the west side of the river, extending from seven rods above the dam down the river to the tannery plot, twenty rods below the dam, and containing one acre." " The mill privilege" would ordinarily be the name of something more than soil and rocks. It would generally be understood to include water-power. With no further description, it might include only a hundredth part of the power of the river, and it might include the whole of it. The deed gives neither the bounds, nor any further separate description, of this piece of property ; but the list of the fourteen parcels of real estate conveyed by the deed is followed by this clause : " all of said described parcels owned and possessed by said Hamlin Rand at the time of his decease, a reference being had to his deeds for a particular description of each." This incorporates and adopts the deed Kelsea to Hamlin Rand, which conveyed the acre and no more power than the trip-hammer privilege.

It is immaterial in this case whether half of the bed of the river was conveyed or not. This action is not a writ of entry for land, but case for diversion of water. Whether the west half of the bed of the river did or did not pass, in 1822, by the deed Swan's executor to Kelsea, the clause " with the privilege of taking sufficient water from said mill-dam and pond to carry a trip-hammer" was intended by the grantor and grantee as a specific and full description and limitation of the water right conveyed with the acre. " The mill privilege" of the deed of 1843 is not more than the acre and its trip-hammer privilege. The rest of the water-power remains the property of the riparian owners on the east side. The

deed taken from Robert by Hamlin's heirs did not lessen their rights, nor enlarge their deed to him. It does not appear that Robert ever had any title except what they conveyed to him in 1843; and they did not convey to him more water-power than a trip-hammer privilege. His claim, and their conveyance to him of fourteen parcels of real estate in settlement of his claim, do not change their conveyance of the trip-hammer privilege into a conveyance of half the power of the river. The case does not present any facts on which judgment can be rendered.

*Case discharged.*

SMITH and CARPENTER, JJ., did not sit: the others concurred in the result.

The defendants moved for a rehearing.

*Bingham, Mitchells & Batchellor*, for the defendants. It becomes necessary to inquire,—*First.* What is the proper and legal construction of the deed Swan to Whiting, dated March 16, 1812? In other words, What did Swan convey by that deed? *Second.* (1) What water rights, upon the westerly side of the river, did Hamlin Rand die seized of? (2) From whom did he derive those rights? (3) What rights did he understand he possessed upon that side, as indicated by his conduct and conveyances? *Third.* (1) Are not his representatives (these plaintiffs) estopped by his conduct and conveyances from now asserting that rights do not exist, which were recognized as existing by Hamlin Rand? (2) Are they not estopped by their own conduct and conveyances in 1843?

What did Swan, in his deed, say he " granted, bargained, and sold," and by the deed " give, grant, bargain, sell, . . . convey " to Whiting? The deed defines the subject of the grant to be " a certain tract or parcel of land," situated in Lisbon. That part of the deed, which defines the estate granted, when analyzed, is divisible into four parts or clauses, viz.,—1. A description and boundary of the land conveyed. 2. An enumeration of some of the rights and privileges incident to the granted premises. 3. Reservations and exceptions carved out of the incidents of the land conveyed. 4. A specific definition, description, and explanation of the land and rights conveyed by the deed.

Description: " a certain tract or parcel of land . . . being part and parcel of lot numbered one, first and second ranges, called the mill lot . . . ." Boundary: " bounded as follows, to wit: Beginning at an oak tree standing a small distance north-westwardly of my store; thence running to a stake and stones on the westwardly side of the road directly opposite to the south-westwardly

corner of the acre of land conveyed by Jesse Young to William Bean; thence northwardly by the westwardly side of the road, as that runs, to the north line of said lot; thence westerly on said north line of said lot to the mill-pond; thence southwardly down the mill-pond to the canal; thence down the canal to the north-east corner post of the saw-mill; thence to the north-west corner post of said saw-mill, and on to the plot conveyed by Ruby Young, administratrix of Jesse Young, to Richard Gookins; thence by said Gookins plot to the oak tree began at." There is, thus far, certainly no grant of water rights, other than such as are incident to the easterly side of the river. The next step taken in the deed is an enumeration of rights incident to the land granted, viz., "together with the saw-mill, apparatus, and utensils, and all the canal water privilege, and a proportionate right in the main dam across the river." This, we maintain, does not and was not intended to convey rights or property in addition to such as were embraced in the preceding general description. This is apparent from the deed, when all its parts are considered. Take this particular clause;—there are in it enumerated three rights,—(1) Mill apparatus and utensils; (2) canal water-privilege; (3) a right in the dam. These, we submit, were included in the preceding general grant, so far as any such rights were given by the deed. This is manifest from the subsequent defining and limiting clause of the deed.

Next in order we reach the clause of the deed providing for reservations and exceptions carved out of the land, rights, and privileges previously conveyed, viz., "saving, reserving, and excepting to myself, heirs, and assigns forever, the exclusive right of the grist or corn-mill with two sets of stones, and to draw water from said canal sufficient to supply the same in preference to any and all other machinery whatever, together with the road or way to the same. Also, reserving to the public the road over the bridge." There is nothing in either of these exceptions or reservations indicating but that they are from the rights incident to the easterly side of the river.

Whatever doubts or uncertainties as to the intention of the grantor, or as to the character or extent of the land, rights, and privileges conveyed, may exist, upon either of the first three clauses of the deed, entirely vanish upon the presentation and consideration of the fourth clause of the deed. This clause dissipates all doubts, makes the meaning of the grantor's previous language clear, distinct, and unmistakable, and puts his intention absolutely beyond peradventure. " Hereby intending to convey all that plot and mill privilege situated west of the road and east of the river, extending, from the oak tree by the lines aforesaid to the north line of the mill lot, saving only to myself, heirs, and assigns, the grist or corn-mill, exclusively with its privileges and way as aforesaid, and to Richard Gookin all the plot and privileges conveyed to him by

Ruby Young, as per her deed to him, and reserving to the public the road over the bridge as aforesaid." He conveys "that plot and mill privilege situated west of the road and east of the river." This is all he conveys. The reservations are from this plot and mill-privilege west of the road and east of the river. After granting the whole of this plot west of the road and east of the river, he then makes his reservations. It is difficult, we submit, for language more plainly to indicate that the entire grant was a strip of land, with its incidents, extending from the road upon the east to the river on the west; and that from this piece of land and its incidents were carved out the reservations. A fair construction of the whole deed can bring the mind to no other conclusion.

Upon this deed, as to the right construction of it, we make three points : (1) The granted estate being bounded east by the highway and west by the river, extends to the centre of each. (2) The rights enumerated in the second clause of the deed are, when the whole deed is given its proper and legitimate weight, only such as are appurtenant and incident to the land described and bounded in the first clause. (3) The last clause of the deed, "hereby intending to convey all that plot and mill privilege situated west of the road and east of the river," being a definite, fixed, and particular description of the granted estate, controls the previous indefinite, general description; and to the bounds there fixed the granted premises must be limited and restrained ; and no rights or privileges except such as are incident and appurtenant to the land embraced within those bounds are conveyed by deed.

In support of our first point, upon the construction of this Whiting deed, we ask attention to our former brief, where are cited authorities in support of it. And, in addition to those authorities, we ask attention to the following, *Mill River Co.* v. *Smith*, 34 Conn. 462, in which it was held that "where land is bounded in a deed by an artificial mill-pond, and not expressly or by clear implication by the margin, the grantee takes to the middle of the original stream, as if no pond existed." "This rule was applied to a mill-pond that had been in existence more than two hundred years." *Jackson* v. *Louw*, 12 Johns. 252, where it was held that "where one of the boundaries of the premises described in the deed is a line to be run up a creek, the line must be run through the middle of the creek, according to its turns and windings." *Hammond* v. *McLachlan*, 1 Sandf. 323, where it was held that a lot bounded by the street extended to the centre of the street. "To the south line" of a street, carries the line to the centre of the street. *Kneeland* v. *Van Valkenburgh*, 46 Wis. 434—*S. C.*, 32 Am. R. 719. "By said road" carries the line to its centre. *Oxton* v. *Groves*, 68 Me. 371—*S. C.*, 28 Am. R. 75;—see, also, *Salter* v. *Jonas*, 10 Vroom 469—*S. C.*, 23 Am. R. 229.

In the second clause, did the grantor enlarge or intend to enlarge the rights, privileges, and estate granted by the first clause ? We

say that a fair construction of the whole deed clearly demonstrates that he did not. It is only by a narrow, illiberal construction of the deed that it can be held that he did. Such a construction cannot possibly be given it except by selecting parts of the deed, and entirely closing the eye to other parts that are equally, yes, more, important and conclusive upon the question of the grantor's intention. "Together with the (1) saw-mill apparatus and utensils, (2) all the canal water privilege, (3) and a proportionate right in the main dam across the river." Is this not simply enumerating some of the rights included in the first clause? Did not the first clause carry with it "the saw-mill apparatus and utensils"? All will doubtless unhesitatingly admit that it did. Did he not grant a "right in the main dam across the river" in the first clause? Certainly he did. Now, then, if in these two instances he simply repeated rights previously given, is it not a fair construction of his whole language to say that he simply, in reference to the canal water, intended to give such water rights, and such only, as were incident and appurtenant to the land granted? We maintain that upon the doctrine of *Seavey* v. *Jones*, 43 N. H. 441, by a fair and reasonable construction of this clause, it is "simply an enumeration of the rights and privileges which were to pass by the deed, as there was of the buildings on the land, all of which would have passed as well without any such distinct enumeration as with it." The deed, the proper construction of which was raised in this case, contained this clause,—"one undivided half of a tract of land in Bradford, on the west side of Warner river, with the saw-mill, clothing-mill, and carding machines therein, with a privilege of flowage, use of water, and repairing of dam, to have and to hold with the privileges and appurtenances to the same belonging." The plaintiff, upon this clause, contended that "the defendant's deed is to be construed as warranting the right to the whole use of the stream and water-power at that place." Upon this position the court said,—"We do not understand by this expression that it was intended, as the plaintiff claims, to convey the land and mills with all the privileges and appurtenances belonging to both, and then an additional and distinct grant of the privilege of flowage, use of water, &c., as rights which would not pass by or be included in the other terms of the grant. The terms used do not indicate any such intention. The land is conveyed with certain mills thereon and with certain privileges, but neither of them need to be particularly described in order to pass by the conveyances, as they all would have passed as appurtenant. If any other rights had been intended, they would, of course, have been particularly described." It is difficult to distinguish this case from the case at bar.

The fourth clause is, "hereby intending to convey all that plot and mill-privilege situated west of the road and east of the river, extending from the oak tree by the lines aforesaid to the north

line of the mill lot, saving only to myself, heirs, and assigns the grist
or corn-mill exclusively with its privileges and ways aforesaid, and
to Richard Gookins, all the plot and privileges conveyed to him by
Reubie Young by her deed to him, and reserving to the public the
road over the bridge as aforesaid." Is not this a material, impor-
tant, and controlling part of the deed? When the grantor delib-
erately declared that "hereby" he intended "to convey the land
and mill privilege" "situated west of the road and east of the
river," he meant it. It will be seen, by an inspection of his lan-
guage in this clause, that he embraced the whole,—the premises
granted, and the rights reserved. The premises granted are a strip
of land west of the road and east of the river, with its incidents
and appurtenances, which follow the grant without being enumer-
ated. The reservations are from this strip of land, and from its
incidents and appurtenances. Let us take the construction, con-
tended for by the plaintiffs, that "all the canal water privilege" is
a separate and distinct grant of water rights, and see where we
land. If they are right, from this canal privilege he carves all the
reservations of water rights. This canal privilege, they say, is
more extensive than the rights incident to the land conveyed. In
his fourth clause he carves all these reservations out of the rights
incident to the land conveyed, *i. e.*, the plot west of the road and
east of the river. Now, then, from which class of water rights do
the reservations really come? Are they from the canal privilege,
or from the rights incident to "that plot and mill privilege situated
west of the road and east of the river"? To adopt the plaintiffs'
construction, the fourth clause must be entirely rejected. But if
the construction contended for by the defendants is adopted, all
the clauses can stand and be given effect. The second enumerates
rights covered by the first; and the fourth defines, limits, and re-
strains the land, rights, and privileges covered by the first and sec-
ond clauses to and within the limits fixed in the fourth clause.
This fourth clause cannot, by virtue of the well established and
universally recognized rules of law governing the construction of
deeds, be rejected. It must be given effect. The rule is well
stated by Judge *Fowler* in *Richardson* v. *Palmer*, 38 N. H. 218, as
follows : "The well recognized rules laid down for the construction
of deeds, justly said to be founded in law, reason, and common-
sense, require that the whole deed shall be considered and con-
strued together, and not any particular portion of it by itself; that
every part shall, if possible, be made to take effect, and every word
to operate; that it shall operate according to the intention of the
parties, if by law it may."

There is still another rule of law, quite as familiar, equally ap-
plicable in the construction of a deed, when the intention of the
grantor is sought, and that is this : Prior or subsequent general,
indefinite descriptions of estates granted, are restricted or con-
trolled by more definite and particular descriptions. This rule we

are entitled to have applied here, because all agree that, in the construction of this deed, it is Swan's intention we are in pursuit of. In this search we are given, by Swan himself, in his own language, which is not open to doubt, his intention, and a specific, definite, and particular description of the estate he intended to convey. When he says he intended to grant the "plot and mill-privilege, situated west of the road and east of the river," did he not mean that? What is there in the deed indicating the contrary? Nothing whatever, we respectfully submit. Then why, if he intended to convey that, and only that, is it, or can it be held, that he intended to and did convey more or less than that, or another and different estate from that, which is described in terms that cannot be misunderstood? In *Barnard* v. *Martin*, 5 N. H. 536, it was held that a deed conveying "my homestead farm in B, that I now live on and improve,—it being the same land conveyed to me and J. M. by C. B., by his deed of December 2, 1816,—said J. M.'s half of which he conveyed to me by his deed of December 19, 1825," did not convey a parcel of adjoining land, conveyed to the grantor by C. B. in 1819, though occupied with the other as one farm. In their opinion, the court said,—"We think we are not at liberty to say that the demanded premises are parcel of the homestead farm intended to be conveyed, when the grantor, by a reference to the deed of 1816 and the deed of 1825, has expressly declared what he understood the homestead farm to be. The last clause in the description is restrictive." The court further say,— "Although the general description might, if it stood alone, be sufficient to pass the demanded premises, yet that description is so restrained by the particular description, that it cannot now have that operation." If the clause "my homestead farm in Bath, aforesaid, that I now live on and improve," is controlled and restrained by the clause "it being the same land conveyed to me and one John Martin by one Caleb Bailey, by his deed of December 2, 1816, and the said Martin's half of which he conveyed to me by deed of December 19, 1825," when the homestead farm embraced more than was conveyed by the deeds mentioned, by what rule of law can it be held that the clause in this Whiting deed, "hereby intending to convey all that plot and mill-privilege situated west of the road and east of the river," does not restrain the preceding general descriptions in this deed? The doctrine in this case (*Barnard* v. *Martin*) was carefully reëxamined in *Woodman* v. *Lane,* 7 N. H. 241. It was further recognized and affirmed in *Flagg* v. *Bean,* 25 N. H. 61. These cases were further affirmed in *Nutting* v. *Herbert,* 35 N. H. 125; *Bell* v. *Sawyer,* 32 N. H. 77. In *Flagg* v. *Bean, supra,* the deed, the construction of which was involved, described the premises conveyed as "three certain pieces, or parcels, of land, situate, &c., bounded S. E. by Bean's land and the cove; N. E., by Cocheco river; W., by Bean's land, land of Boyle and of Hurd, and the road;" and then adds, "meaning to

convey all the land I purchased of S. D. Bryant, L. Bean, and A. Pinkham, referring to their deeds for particulars." The plaintiff contended that this deed conveyed all the land described in the deeds referred to, and not the interest conveyed by those deeds. The court held otherwise. Their holding was as follows: "A deed conveying land by description which includes an entire tract, will be restricted to an undivided half by a clause in this form: 'Meaning to convey all the land I purchased of B, set forth in his deed recorded,' &c., if that deed conveys but an undivided half." And the court, after reviewing the cases of *Barnard* v. *Martin* and *Woodman* v. *Lane*, before cited, say,—"In neither of these cases is the language any more clear or explicit than it is in the present case; and the principle there established, we think, must limit the general description in Flagg's deed to Bean, to the undivided half set forth in two of the deeds, and to the particular interest purchased by the deed of Bryant." The application of these rules of construction to this Swan deed brings us legally, logically, and inevitably to the conclusion that Swan intended, by his deed, to convey a "plot and mill privilege" which was "situated west of the road and east of the river;" and he conveyed nothing more than that "plot and mill privilege," and that is limited by the centre of the river. This being so, in Swan remained vested the water rights incident to the westerly side of the river.

What water rights, upon the westerly side of the river, did Hamlin Rand die seized of? From whence did he derive those rights? What rights did he understand he possessed upon that side, as indicated by his conduct and conveyances? If we are right upon our first point, viz., that Whiting's deed conveyed no rights except those incident to the easterly side of the river, it follows that Swan died seized of all rights incident to the westerly side of the river. And, according to the case, Hamlin Rand died seized of such and the same rights, at this point, as Swan died seized of; consequently, at his death, Hamlin Rand was possessed of all the water rights which were incident to the westerly side of the river. These rights Rand got in the following mannner, viz.: He was executor of Swan, and, in his representative capacity, had title to them. By his deed, as executor of Swan, he, on June 13, 1822, conveyed to Orlando Kelsea "One acre of land" on the westerly side of the river, "with the privilege of taking sufficient water from said mill dam and pond to carry a trip-hammer." In this same deed, and immediately following the clause just quoted, Rand makes the following reservations: "Saving, reserving, and excepting to said Rand, in his said capacity, all water-privileges upon said premises and the privilege, at any time hereafter, of erecting any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying to said Kelsea whatever damage shall accrue to said land by the use aforesaid." These

reserved rights remained in Rand, as executor, until April 5, 1824, when, by his deed of that date to William Morrison, he conveyed "the acre" by the following clause: "Also one acre of land on the west side of the river, opposite to said mill." From this he excepts and reserves that which was conveyed to Kelsea June 13, 1822, viz., "also, saving as aforesaid one acre sold by me as executor, and included in my deed to Orlando Kelsea, dated June 13, 1822."

Thus it will be seen that Rand conveyed the acre, which carried all the water rights incident to it, as well as the land. He then reserved the acre, as conveyed to Kelsea, which left vested in Morrison all the water rights appurtenant to the acre, with the right of using the acre to erect thereon any kind of mills or machinery, less the trip-hammer privilege conveyed to Kelsea. In effect, the deed of Morrison granted the same rights that he would take had the language of Rand's deed to him been as follows: "I grant and convey all water privileges upon said premises [the acre] and the privilege, at any time hereafter, of erecting any kind of mills or machinery upon said premises [the acre], and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying Kelsea whatever damage shall accrue to said land." On the same day, April 5, 1824, Morrison reconveyed to Rand, in his individual capacity, "the same premises, by the same description." The effect, then, of these two deeds was to vest in Rand, in his private right, the rights which he reserved in his deed to Kelsea in 1822, viz., "all water-privileges upon" the acre, and the "privilege of erecting any kind of mills or machinery upon it." Rand not only had a trip-hammer privilege, but "all the water privileges upon" the acre, except the trip-hammer privilege, and having that he had the whole water rights appurtenant to the acre.

In recapitulation, then, Rand, at the time of his decease, was vested with water rights as follows: (1) By Morrison's deed of April 5, 1824, of all the water-privileges of the acre, except the trip-hammer privilege; (2) By Kelsea's deed of July 23, 1831, with all of Kelsea's "right to any water-privilege which the aforesaid deed of June 13, A. D. 1822, may have given" him (Kelsea), which was the trip-hammer privilege. Thus, after this deed of Kelsea, of 1831, Rand was vested with all the water rights appurtenant to the acre. He died possessed of those rights. His heirs (these plaintiffs) inherited those rights. They owned them until their deed of May 4, 1843. By that deed they conveyed those rights to Robert Rand, and he conveyed them to the defendants, or those under whom they claim; and the defendants, as against the plaintiffs, now own them.

"Thus it appears," says the referee, "that July 23, 1831, all the title which James I. Swan, at the time of his death, had to land and water rights on both sides the river was in Hamlin Rand.

Those water rights were all that were then appurtenant to the land on the east side of the river, excepting such as passed by the deed of Swan to Whiting, and all water rights, more or less, which were then appurtenant to the land on the west side." At his decease, Rand possessed the same rights he did on July 23, 1831. By the deed of May 4, 1843, to Robert Rand, he became vested with "all the title which James I. Swan, at the time of his death, had to land and water rights on" the west side of the river. Robert conveyed that land and those rights to the defendants, or those under whom they claim. The defendants, as against the plaintiffs, are now vested with "all the title which James I. Swan, at the time of his death, had to land and water-rights on" the west side of the river.

The next inquiry is, What was the extent of those rights as understood by Hamlin Rand? He ought to be good authority as to the extent of his rights. And these plaintiffs ought to be, and we submit they are, estopped from denying that those rights are as extensive as he asserted them to be. They stand in his place, take his title, and are bound by his acts, which constitute the elements of that title. The extent and character of those rights, as defined by Hamlin Rand, were as follows: June 13, 1822, in his deed to Kelsea, he asserted those rights to be as follows: (1) "One acre of land." (2) "The privilege of taking sufficient water from said mill-dam and pond to carry a trip-hammer." (3) All water appurtenant to the acre, in excess of the trip-hammer privilege, "and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose." These rights he asserts in his own deed, over his own signature. Did he grant a trip-hammer privilege, and reserve the right "of erecting any kind of mills or machinery" upon land that had no water appurtenant to it?

Hamlin Rand, in his deed to Morrison, April 5, 1824, asserts the same rights, and to the same extent, by conveying to Morrison "one acre of land on the west side of the river, opposite to said mill," and reserving "one acre sold by me as executor, and included in my deed to Orlando Kelsea, dated June 13, 1822." This deed gives Rand simply the rights reserved by him, as executor, in his deed to Kelsea. The absurdity into which the plaintiffs' contention puts Hamlin Rand, as to this deed, is this,—conveying to Morrison an acre of land, which two years before he had granted Kelsea, and then reserving to Kelsea all he conveyed to Morrison. Upon the plaintiffs' view, what becomes of the rule of law, that reservations are from the estate granted? or that other and equally familiar one, that a grantor is presumed to have granted something? or that other common-sense rule, that every sane man is presumed to act sensibly, and not foolishly? They plunge their father into the same folly in respect to the deed of the same day,—

April 5, 1824, from Morrison to him,—because in that deed Morrison conveys to Rand "one acre of land on the west side of the river opposite to said mill," and reserves "one acre sold by him [Rand] as executor, and included in his deed to Orlando Kelsea, dated June 13, 1822." In our pursuit of Hamlin Rand's understanding of the extent of these water-rights, we find him, on July 23, 1831, taking a conveyance from Kelsea of (1) the acre; (2) all the water rights conveyed by him, as executor, to Kelsea by the deed of June 13, 1822, which consisted of the trip-hammer privilege. He then had (1) from Morrison all the water-rights appurtenant to the acre, except the trip-hammer privilege; (2) from Kelsea the acre and trip-hammer privilege, which comprised the whole acre, and its appurtenant rights upon the westerly side. Possessed of these rights, on March 28, 1832, he further asserted their extent, in a lease to Joseph Boynton. This lease has no materiality whatever, except as showing the extent of Hamlin Rand's water-rights as granted and reserved in it. In this lease he granted to " Boynton, his heirs and assigns . . . a right and privilege to take water out of the westerly side of the mill-pond, . . . sufficient to enable said Joseph to grind bark, and full, and roll leather at his said tannery, and to supply his vats with water." The water was to be carried over the acre. This right was to terminate when "said Hamlin should erect a factory or mill of any description on the land over which the water is to be carried to the tannery aforesaid, or sell said land to any person for the purpose of erecting mills or factories." If the plaintiffs are right in their contention, Hamlin Rand granted water on the westerly side that did not belong there, and he contemplated the erection of mills and factories in the operation of which water would be indispensable, and he did not have a particle of water to run them.

The deed of 1843 incorporates and adopts not only the deed of Kelsea to Rand, but also the deed of Rand to Kelsea of June 13, 1822; the deed of Rand to Morrison of April 5, 1824; the deed of Morrison to Rand of April 5, 1824. The deed of Morrison to Rand, in 1824, in effect, as we have shown, conveyed to Rand "all the water privileges upon said premises [the acre], and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose by paying to said Kelsea whatever damage shall accrue to said land by the use aforesaid." An examination of the deeds of Rand to Morrison and Morrison to Rand, bearing date April 5, 1824, in connection with that of Rand to Kelsea in 1822, and that of Kelsea to Rand in 1831, will show the great materiality of those deeds of 1824. As we have before shown, in 1824 Rand conveyed to Morrison "one acre of land on the west side of the river opposite to said mill." This is an absolute, unqualified conveyance of the acre of land bounded easterly by the river, which, according

to Blackstone and Coke, carries everything connected with it. "For land," says Sir Edward Coke, "comprehendeth, in its legal signification, any ground, soil, or earth whatsoever: as arable, meadows, pastures, woods, moors, waters, marshes, furzes, and heath." 2 Bl. Com. 17; 1 Inst. 4. From this absolute conveyance of the acre he reserves such rights as he had granted Kelsea by his deed of June 13, 1822. When all the deeds covered by the reference in the deed of 1843 are examined, it will appear most conclusively that "the mill privilege" was not merely a "trip-hammer privilege," but was an acre of land, with all of its appurtenant water rights unlimited and unrestricted.

There is another element to which we especially invite attention, and that is, the act of Robert Rand the next day in conveying the "mill privilege," and bounding it easterly by the river. The referee finds that this plot, bounded easterly by the river, without exception or qualification, "is the same as that described" in the deed of the heirs to Robert as "the mill privilege." Here is a distinct finding of the fact that "the mill privilege" is "a certain plot called the mill privilege, on the west side of the river in said village, bounded as follows: Beginning at a point about seven rods above the mill-dam across the river in said village; thence down the river to the north-east corner of the tannery plot," &c.

Our third inquiry is,—(1) Are not the plaintiffs, being simply the representatives of Hamlin Rand, estopped by his conveyances, and his interpretation of them, from now setting up a claim inconsistent with them? (2) Are they not estopped by their own conduct and conveyance in 1843? The plaintiffs set up Swan's deed to Whiting against the defendants. Are they at liberty to do this? Their title, such as it is, comes from Swan through his executor, Hamlin Rand. What did Swan, by his executor, covenant, in his deed to Kelsea in 1822 and his deed to Morrison in 1824? When he conveyed to Kelsea, in 1822, the acre and trip-hammer privilege, he covenanted that he would "warrant and defend the said premises against the lawful claims and demands of all persons claiming by, from, or under the said James I. Swan . . ." By the deed to Morrison, in 1824, Swan, by his executor, conveyed to said Morrison, in effect, as we have before demonstrated, "all water privileges upon said premises [the acre], and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying to said Kelsea whatever damage shall accrue to said land by the use aforesaid." He then covenanted to "warrant and defend the said premises from the lawful claims and demands of all persons claiming by, from, or under the said James I. Swan . . ." In view of these covenants against all persons claiming by, from, or under Swan, how is it open to these plaintiffs to set up the Whiting deed, or any other deed, against the parties hold-

ing the title granted to Kelsea and Morrison? It must be remembered that both Kelsea and Morrison conveyed to Hamlin Rand all that Swan, by his executor, conveyed to each of them. Morrison did it as follows: " I . . . have remised, released, and forever quitclaimed, and do by these presents remise, release, and forever quitclaim, unto the said Hamlin Rand, his heirs and assigns forever, all the right, title, interest, claim, and demand" to the estate granted. This carried Swan's covenants, made by his executor, because the covenants were not limited to Morrison; they extended to his assigns. Covenants of warranty run with the land. Rawle Cov. 313. Kelsea conveyed the interest he got from Swan's estate by terms which in effect came to the same; and his conveyance to Rand carried with it Swan's covenant of warranty made by his executor "with the said Kelsea, his heirs and assigns." These rights, title, and covenants were vested in Hamlin at the time of his decease, and consequently were in his heirs in 1843, when they conveyed to Robert, and through Robert they have come to these defendants; and, as against these defendants, no one " claiming by, from, or under Swan" can assert a claim to them.

The defendants, then, as against Swan, or those claiming under him, are vested with the title to land and rights as follows: (1) " All water privileges upon said premises [the acre], and the privilege at any time hereafter of erecting any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying Kelsea," &c., except a trip-hammer privilege. (2) The acre. (3) The trip-hammer privilege. The title to this land and these rights becomes vested in the defendants by virtue of the following chain : Rand, as executor, conveyed the acre and trip-hammer privilege to Kelsea in 1822, reserving the other water rights to himself as executor. These rights, which he reserved in Kelsea's deed of 1822, he conveyed to Morrison in 1824. These two conveyances divested Swan's estate of the title to all the interests, viz., the acre, the trip-hammer privilege, and all the other water rights appurtenant to the acre, and warranted the title to them, to Kelsea and Morrison, and their respective heirs and assigns, against all persons claiming by, from, or under Swan. At this instant of time Rand had no title to either of these interests in his representative or private capacity. He never after this had any interest in either right in his representative capacity; but in his private capacity he became vested with the title to all the land and rights granted to both Kelsea and Morrison as follows: Morrison, on April 5, 1824, conveyed to him all that Swan's estate had previously, on the same day, deeded to Morrison. By this deed Rand got all water rights west of the river except the trip-hammer privilege. Kelsea, on July 23, 1831, conveyed to Rand the acre and trip-hammer privilege. Rand was then vested with the title to the acre, and all water rights appurtenant to it. He died seized of those

same rights.   His heirs inherited them; they conveyed them to Robert; Robert conveyed them to the defendants.

In recapitulation, it is submitted,—

1. Assuming that the construction of the Whiting deed is a proper subject for consideration in this case, it conveys no water rights except those appurtenant to the easterly side of the river.

2. The Whiting deed cannot be here introduced to limit the rights of these defendants, or in any way affect them, because their title rests upon deeds containing covenants against all claims by, from, or under Swan.   This sweeping covenant embraces the Whiting deed.

3. Rand having died seized of all the westerly water rights, and the plaintiffs having inherited them, and they having conveyed them to the defendants through Robert, they cannot now question the use and enjoyment of those rights by the defendants, and they are estopped from asserting to them any right, title, claim, or interest of any kind, nature, or description.

4. The conveyances of 1843, to and from the plaintiffs and Robert, when construed and interpreted in the light of the then existing situation, with Robert's claim to equitable rights and interests, which was recognized, acquiesced in, and yielded to by the plaintiffs, let these conveyances be termed division, partition, or compromise, result in nothing more nor less than a conveyance by Robert of the lands and water rights east of the middle of the river to the plaintiffs, and a conveyance by the plaintiffs to Robert of the land and water rights west of the middle of the river.   It is admitted that the plaintiffs conveyed something to Robert. Why did they convey him anything?   Because he owned an interest there.   If he owned anything, he owned half   Owning half, that was the measure of the rights granted him.   To convey him less than this would be to grant him less than his interest.

DOE, C. J.   In 1803, Jesse Young owned land, mills, and water-power on the east side of the river: on the west side there was no mill, canal, or use of the dam or pond.   In that year, and in that condition of land and water, Young received from Obadiah Belknap, for the expressed consideration of $10, a conveyance of an acre of land, bounded, in part, "as follows, viz. beginning at the northeasterly corner of the Belknap Lot so called, west side of Ammonoosuck River, opposite the said Young's mills, thence running twenty rods on the river bank . . . and is to contain one full acre be the same more or less."   This acre was at the west end of the dam, and extended seven rods above the dam and twenty rods below it.   By the boundary "on the river bank," the deed seems to convey the west half of the river; but it makes no express mention of the dam, or of any water-power or mill privilege, belonging to or conveyed with the acre: and the case does not show what the grantor could convey.

In 1808, no water-power having been used on the west side, the heirs of Jesse Young conveyed to Israel Swan and James I. Swan, for the expressed consideration of $2,500, "two certain tracts of land with the mills, mill-dam and waterfall of Amonoosuck River appurtenant thereto, all situated in said Concord [now Lisbon], comprising all the mill lot, so called, being N°. one in the first and second ranges, containing by estimation one hundred acres of land, be the same more or less, with the grist mill, saw mill and waterfall belonging to said lot, also one acre of land on the west side of the river opposite to said mills, conveyed, by Obadiah Belknap to our late father, Jesse Young Esquire, as per his deed thereof, . . . saving, reserving and excepting out of said premises" a lot "conveyed by our said father to Wm. Bean, . . . also a certain strip or piece of land, with certain privileges and immunities sold and conveyed by our mother Ruby Young, administratrix of our said father's estate, to Richard Gookins, as per her deed thereof."

In 1812, James I. Swan had acquired the title of his co-grantee, Israel Swan. There were then, on the east side, a saw-mill and a grist-mill belonging to James I. Swan, and a cloth-mill on the lot conveyed by Young's administratrix to Gookins. The three mills were operated by water from a single canal. On the west side there was no mill, canal, or use of the dam or pond. By the dam and canal, the natural condition of the stream, above and below the dam, was rightfully changed. In fact and in law, the water-power of the east side was not less than the capacity of the canal to pour the river upon the wheels of the three mills. In that actual and lawful condition of land and water, March 16, 1812, James I. Swan conveyed to Whiting, for the expressed consideration of $1,490, "a certain tract or parcel of land . . . being part and pracel of lot numbered one, . . . called the mill lot, . . . bounded as follows, to wit, beginning at an oak tree . . . thence running to a stake and stones on the westwardly side of the road . . . . thence northwardly by the westwardly side of the road, as that runs, to the north line of said lot, thence westerly on said north line of said lot to the mill pond, thence southwardly down the mill pond to the canal, thence down the canal to the northeast corner post of the saw mill, thence to the northwest corner post of said saw mill and on to the plot conveyed by Ruby Young, administratrix of Jesse Young to Richard Gookins, thence by said Gookins plot to the oak tree began at, together with the saw-mill apparatus and utensils and all the canal water privilege and a proportionate right in the main dam across the river, saving, reserving and excepting to myself, heirs and assigns forever the exclusive right of the grist or corn mill, with two sets of stones and to draw water from said canal sufficient to supply the same in preference of any and all other machinery whatever, together with the road or way to the same. Also

reserving to the public the road over the bridge.   Hereby intending to convey all that plot and mill privilege situated west of the road and east of the river, extending from the oak tree, by the lines aforesaid, to the north line of the mill lot, saving only to myself, heirs and assigns, the grist or corn mill exclusively with its privileges and way as aforesaid, and to Richard Gookins all the plot and privileges conveyed to him by Ruby Young, as per her deed to him, and reserving to the public the road over the bridge as aforesaid."

This deed left in Swan a preferred right to draw from the canal sufficient water to operate his "grist or corn mill with two sets of stones," and it did not convey the cloth-mill right that had been previously sold to Gookins.   The rest of "all the canal water privilege" passed to Whiting.   The only limit of that privilege was the capacity of the canal.   If the whole river would flow through the canal, Swan retained no more of the power than enough to operate his grist-mill with two sets of stones.   If the whole river would not flow through the canal, the surplus remained his, with no limitation restricting its use to either side of the river.   Before this conveyance Swan owned all the power of the river except the cloth-mill privilege: he could sell all his power to be used on either side: and this deed does not show that " all the canal water privilege" on the east side was less than the whole river.   If Swan and Whiting had understood that only half of the river was divided among the three mills, and that Swan continued to own the other half in addition to what he reserved, it is not probable that the deed would have been silent on that subject.   The three mills, for whose operation the deed retained on the east side "all the canal water privilege," had always had all the water of the river that the canal could carry to them; and there is no reason to suppose a provision restricting them to a smaller quantity would have expressed the intention of the parties.   If it can be assumed that the canal was not large enough to carry off the spring freshets, it cannot be taken for granted that the river was large enough in August to fill the canal.   If the entire stream, or more than half of it, would run through the canal during the dry season, " all the canal water privilege" did not leave half of the stream annexed, in that season, to Swan's acre on the west side.

A part of the boundary was, "westerly on said north line of said lot to the mill pond, thence southwardly down the mill pond to the canal."   If this were severed from the rest of the description, it might include the east half of the pond or river above the dam.   But the west line, when it reaches the canal, runs, not down the river, but " down the canal to the north east corner post of the saw mill, thence to the north west corner post of said saw mill, and on to the plot conveyed by Ruby Young administratrix of Jesse Young to Richard Gookins, thence by said Gookins plot to the oak tree began at."   This excludes the Gookins cloth-mill,

the grist-mill, and land between the canal and the river; and the exclusion of those mills and the lots belonging to them suggests a reason for running the west line down the canal, and not down the river. The expressed intention was not "to convey all that plot and mill privilege situated west of the road and east of the river," but "to convey all that plot and mill privilege situated west of the road and east of the river, extending from the oak tree, by the lines aforesaid, to the north line of the mill lot," with reservations. " By the lines aforesaid" " from the oak tree" " to the north line," the "plot" was bounded easterly on the road, and westerly on " Gookins plot," thence on a line running from " Gookins plot" by the north-west corner of the saw-mill to the north-east corner of the saw-mill, thence on the canal and pond to the north line. These metes and bounds do not include half of the bed of the river below the dam where the waterfall produced power, and are not evidence of an intention to make half of the river a limit of "all the canal water privilege." The bounds of the lot, the general and special descriptions of the lot and water-power, and the condition of both banks of the river agree in proof that the parties understood the canal was the measure of " all the canal water privilege," and that they did not recognize or contemplate a division of the river into two equal parts, and an annexation of one half to each of its banks. As, on the one hand, Whiting took no more power than the remainder of the canal privilege after it supplied the cloth-mill and grist-mill, even if that remainder was not enough for his saw-mill, so, on the other hand, he took no less than that remainder, even if it was more than the saw-mill needed. Of the water right conveyed to him the deed gives no other measure than the canal less the rights of the other two mills. Had the defendants owned the west side of the river and half of the dam and power in 1812, " all the canal water privilege" on the east side would have been limited by Swan's title on the east side. But as Swan owned not only all the east side except the Gookins privilege, but also the acre on the west side on which there was no mill, canal, or use of water, there is no ground for an inference that " all the canal water privilege" was understood by Swan and Whiting to be limited by the volume of half the river. In *Seavey* v. *Jones*, 43 N. H. 441, there was nothing to show that "a privilege" was more than the operative power of certain mills. In this case there is nothing to show that " all the canal water privilege" was less than the operative power of the canal.

June 13, 1822, Swan's executor conveyed to Kelsea " all the right, title, interest, claim, and demand of which the said James I. Swan died seized of in and unto" the acre on the west side, " with the privilege of taking sufficient water from said mill dam and pond to carry a trip hammer, saving, reserving and excepting" to the grantor in his capacity as executor " all water privileges upon said premises, and the privilege at any time hereafter of erecting

any kind of mills or machinery upon said premises, and of using the same for that purpose, and the right of passing and repassing over the same for that purpose, by paying to said Kelsea whatever damage shall accrue to said land by the use aforesaid, the damage to be appraised by three uninterested persons chosen by said Kelsea and the said" grantor. The defendants do not contend that this deed conveyed a larger water right than a trip-hammer privilege. The reservation is evidence of an intention of the grantor to retain, in his capacity as executor, a right of building mills on the acre, and using water-power there, "by paying to said Kelsea whatever damage shall accrue to said land by the use aforesaid." This reserved right of purchasing a right of using the acre was never exercised by any one. It does not appear that the executor was empowered by Swan's will to reserve such a right to be exercised by himself in any capacity. He had a testamentary power of sale; but it does not appear that any legal estate was vested in him. Whether the reservation was valid or void, the deed severed a trip-hammer privilege from the water-power of Swan's heirs, conveyed that privilege to Kelsea, and left the rest of their water right in them. Kelsea held his title nine years. In 1831 he conveyed the acre to Hamlin Rand as "a certain tract or parcel of land" described by metes and bounds. In the deed the description of the acre is followed by this clause: "Also I convey to him the said Rand by this instrument all my right to any water privilege which the aforesaid deed of June 13, A. D. 1822 may have given me." The defendants do not contend that this deed could convey a larger water right than Kelsea's trip-hammer privilege. That privilege and the acre were the mill-privilege conveyed to Kelsea by Swan's executor in 1822. They were Kelsea's mill-privilege from 1822 to 1831. They were the mill-privilege conveyed by Kelsea to Hamlin Rand in 1831. Were they "the mill privilege" conveyed by Hamlin's heirs to Robert Rand by the deed of 1843? That deed conveyed fourteen parcels of real estate, "all of said parcels owned and possessed by said Hamlin Rand at the time of his decease, a reference being had to his deeds for a particular description of each." " The mill privilege" of the deed of 1843 is to be found by a reference to the deeds of Hamlin Rand. By his deed from Kelsea, Hamlin had acquired the acre and Kelsea's trip-hammer privilege.

The only other deeds by which the defendants contend Hamlin acquired a title that made "the mill privilege" of the acre anything more than the trip-hammer privilege, were the simultaneous conveyances of 1824 from Swan's executor to Morrison, and from Morrison to Hamlin. Morrison was a mere conduit, employed because Hamlin was Swan's executor; and the two deeds may be regarded as a single conveyance from Swan's executor to Hamlin. As both the parties in this suit claim under this conveyance, they do not question its validity. The referee has not found that

Swan's heirs did not assent to it.   It conveyed "all the right, title, interest, claim and demand of which the said James I. Swan died seized of in and unto two certain tracts of land, with the gristmill, mill dam and waterfall of Ammonoosuck River appurtenant thereto, all situated in Concord [now Lisbon] in county of Grafton, comprising all the mill lot, so called, being number one in the first and second ranges, containing by estimation one hundred acres of land, be the same more or less, with the grist mill, mill dam and waterfall belonging to said lot, also one acre of land on the west side of the river opposite to said mill, saving, reserving and excepting out of said premises as saved, reserved and excepted in James Young and others deed of said premises to the said James I. Swan and to Israel Swan, bearing date August 22d A. D. 1808, recorded 25th May 1809, Lib. 49 fol. 78, one acre of land sold and conveyed by Jesse Young to William Bean, as per his deed thereof; also a certain strip or piece of land with certain privileges and immunities sold and conveyed by Ruby Young, administratrix of said Jesse Young's estate, to Richard Gookins, as per his deed thereof; also saving, reserving and excepting forty five acres east end of said lot, conveyed by the said James I. Swan to James Young and others by deed bearing date Decr. 31, 1808, recorded Lib. 47, fol. 520; also saving out of said premises a little more than an acre of land conveyed by said Swan to David Scott by deed bearing date Aug't 16, 1810, recorded Lib. 53, fol. 317; also saving out of said premises whatever was conveyed by said Swan to Stephen H. Whiting by deed bearing date March 16, 1812, recorded Lib. 55, fol. 298; also saving as aforesaid whatever was conveyed by said Swan to Ebenezer Cushman by deed bearing date April 23d, 1813, recorded Lib. 68, fol. 352; also saving as aforesaid ten acres conveyed by the said Swan to Ebenezer Morris and wife; also saving as aforesaid one acre sold by me as executor and included in my deed to Orlando Kelsea dated June 13th A. D. 1822."

The acre on the west side did not pass by this deed.  It belonged to Kelsea, and could not be conveyed by Swan's executor; and for that reason, apparently, the deed excepted it out of the granted premises.   The deed was substantially copied, so far as it could be, from the deed of Young's heirs to the Swans.  "All the mill lot, so called, being N° one in the first and second ranges, containing by estimation one hundred acres of land be the same more or less, with the gristmill, sawmill and waterfall belonging to said lot, also one acre of land on the west side of the river opposite to said mills," is the language of the deed by which the Swans acquired their title in 1808.   "All the mill lot, so called, being number one in the first and second ranges, containing by estimation one hundred acres of land, be the same more or less, with the grist mill, mill dam and waterfall belonging to said lot, also one acre of land on the west side of the river opposite to said mill," is

the language of the deed by which Hamlin Rand acquired title from Swan's executor in 1824. In copying, the scrivener wrote "also one acre of land on the west side of the river opposite to said mill;" and instead of taking the acre out of his draft by an erasure, he took it out by the clause "also saving as aforesaid one acre sold by me as executor and included in my deed to Orlando Kelsea dated June 13th, 1822." This was one of eight saving clauses that excepted parcels of real estate which the grantor could not convey. The two exceptions of the deed of 1808 were substantially copied, and more were added to show how much of the premises of the deed of 1808 did not pass by the deed of 1824. The saving clause, excepting the acre, gave as a reason for excepting it the impossibility of the grantor's conveying to Hamlin Rand in 1824 the acre which the same grantor had conveyed to Kelsea in 1822. The grant and its accompanying exception conveyed neither the acre, nor any water right belonging to it. No water right belonged to the acre except Kelsea's trip-hammer privilege. The rest of the power belonged to the owners of the east bank. If more than the trip-hammer privilege had belonged to the acre, it would have belonged to Kelsea, the owner of the acre, and could not have been conveyed by Swan's executor to Hamlin Rand.

After the conveyance of 1822, and before the conveyance of 1824, Swan's heirs owned, on the east side, a part of "the mill lot" between the canal and the middle of the river. They owned the grist-mill on that land, and enough of the "canal water privilege" to work that "mill with two sets of stones." They also owned the residue of power left after deducting from the river both the "canal water privilege" and Kelsea's trip-hammer privilege. By agreement with the other owners of the "canal water privilege," the canal could be enlarged to enable Swan's heirs to use their residue on their own land. Without such agreement Swan's heirs could draw all their residue through a water-way which they could construct, on their part of "the mill lot," from the dam to their grist-mill, or to any other mills they might choose to build on their own land. If the reservation in the deed of 1822 was valid, they had a right to call on Swan's executor and Kelsea to endeavor to agree upon three appraisers of the damage that would be done Kelsea by their "erecting any kind of mills or machinery upon" his acre, and by their use of his acre for mill purposes; and they could resort to legal proceedings for taking a right of use, measured and defined with the reasonable certainty required in a taking of private property for public use under the mill act of 1868   *Town* v. *Faulkner*, 56 N. H. 255. Their use of Kelsea's property would be under the reservation of the deed of 1822, and not under the mill act: but the reservation gave them no right of use without prepayment of assessed damages; and the damages could not be assessed without a determination of the extent of the proposed use. After assessment and payment of the damages, they could

exercise the right of use thus obtained by purchase. Without assessment and payment, their use of his acre would be a trespass. Such questions as the validity of the reservation, the quantity of water the heirs could elect to turn upon Kelsea's acre, the effect of an inability of Swan's executor and Kelsea to agree on three assessors of damages, and the duration of the reserved right of purchase, were not raised : no attempt was made by Swan's executor or heirs, or by any assignee or representative of either of them, to obtain the assessment, or make the payment, without which a right to use the acre under the reservation could not be acquired. The unexercised right of acquisition did not establish in Swan's heirs, on Kelsea's land, the title of a mill-privilege consisting of half of the waterfall. It cannot be assumed that "all the canal water privilege" left room for such a title. And if it were proved that the canal could not carry half of the river in the dry season, the heirs' unexercised right of purchasing a right to use Kelsea's acre would not annex to his land, or to their right to buy a right to use his land, one half of the waterfall which they could use on their part of "the mill lot." Under a statute incorporating them as a railway company, and authorizing them to take a right of way across Kelsea's acre on payment of damages to be assessed, their right to buy a right of way would not be a railroad before the damages were assessed, and before a location or survey was made. Their unexercised right to buy of Kelsea a right to use some or all of their water-power on his land was not a "mill privilege" in the sense in which those words were used in the deed of 1843.

A right of Swan's heirs to use Kelsea's acre on prepayment of damages to be assessed was a peculiar property that Hamlin Rand did not undertake to convey to himself in 1824 by the copied grant of the acre accompanied by the saving clause that expressly excepted the acre from the operation of the grant. If the right to compel Kelsea to sell a right to use his acre had been regarded by Hamlin as assignable and valuable, it is not improbable that he would have undertaken to convey it from the heirs to himself. But it is more probable that he deemed it unassignable or worthless than that he undertook to assign it by the copied grant of the acre apparently neutralized by the exception of the acre, with no mention of the right to buy a right of use. There is not a word in his deed that informs the reader of the existence of a right of purchase, or of the existence of any water right on the west side of the river. Like the deed of 1808, from which it was largely copied, it describes the lot on the east side as "the mill lot so called," and the waterfall as the "waterfall belonging to said lot;" and it describes the lot on the west side as "one acre of land." From these descriptions the reader would naturally infer that the whole "waterfall" belonged to "the mill lot;" that the only "mill lot" was on the east side; and that no mill-privilege belonged to

the acre on the west side.   If this is a deed to which the deed of
1843 refers " for a particular description of" "the mill privilege"
on the west side, it is a refutation of the defendants' claim that
half of the waterfall belonged to that privilege.

If the deed of 1824 had contained an express grant of all the
property and rights reserved in the deed of 1822, that is, "all
water privileges upon said premises and the privilege" of compell-
ing Kelsea to sell a right to use the acre for mill purposes, such a
grant would have been neither an annexation of half of the water-
fall to Kelsea's property, nor a description of half of the waterfall
as a mill-privilege conveyed by Hamlin to himself on Kelsea's land.
The defendants' claim would not have been sustained by such a
grant accompanied by the clause relating to all the title Swan had
in "the mill lot" on the east side and the "waterfall belonging to
said lot."    Such a grant would have been consistent with the con-
temporaneous condition and use of the waterfall in the light of
which it would have been read.    In fact and in law, " all the
canal water privilege" belonged to " the mill lot" on the east side
where the three mills were located; there had been no use of
water on the west side: and in the light of this actual and right-
ful condition of the stream, the supposed grant would not have
established in Hamlin Rand, on Kelsea's acre, the title of a mill-
privilege consisting of half of the waterfall.    If the reserved right
of buying a right to use their water-power on Kelsea's land had
been exercised by Swan's heirs, or had been conveyed from them
to Hamlin Rand, and had been exercised by him, and if a mill-
privilege had been established there under the reservation of 1822,
"the mill privilege" of the deed of 1843 might have been more
than the trip-hammer privilege.    It does not appear how much of
the waterfall would or could have been employed in such an enter-
prise.    It cannot be assumed that half of the river could have been
rightfully used on the west side.    How extensive a right of using
Kelsea's acre Swan's heirs or Hamlin Rand would have elected to
buy, and how much of their water-power they would have elected
to use in the mill they did not build, are mere matters of con-
jecture.

The meaning of "all water privileges upon" the acre, in the res-
ervation of the deed of 1822, is a question which there is now no
occasion to decide.   Literally it included the trip-hammer priv-
ilege which that deed conveyed.   If its legal construction did not
include that privilege, it had no effect as a reservation of water-
power; the grant conveyed no more of the waterfall than enough
"to carry a trip hammer;" the rest of the heirs' water-power
would have remained theirs without the reservation.   The rest
was the grist-mill right, and the residue left after deducting "the
canal water privilege" and the trip-hammer privilege from the
waterfall.   Whether the deed of 1822 did or did not reserve the
trip-hammer privilege, or a right to buy a right to use it on the

acre, the reservation had no meaning that is material in this case. Its legal construction did not establish in Swan's heirs, on Kelsea's acre, a mill-privilege consisting of half the waterfall taken out of their grist-mill right, or out of their residue.   Their grist-mill right and their residue passed to Hamlin Rand by the deed of 1824 as part of the "waterfall belonging to" "the mill lot;" and if that deed had expressly conveyed all reserved "water privileges upon" Kelsea's acre, and the reserved right of buying a right to use his acre, it would not have introduced on the acre a mill-privilege consisting of half the waterfall, not carved out of the heirs' grist-mill right, or out of their residue, by the deed of 1822, and not .eft on the acre by that deed.   The deeds of 1822 and 1824 did not move the grist-mill right across the river, and did not annex any part of the residue to Kelsea's land, or to a right of using his land obtainable by the reserved right of purchase which has not been exercised.   If that right had passed to Hamlin Rand in 1824, it would have been extinguished in 1831 by his purchase of the acre without an exercise of the reserved right of purchasing a right to use the acre.   Whether the reserved right of purchase was or was not conveyed to him, it was not "owned and possessed by said Hamlin Rand at the time of his decease," and therefore did not pass to Robert Rand by the deed of 1843.

After his purchase of the acre, Hamlin could use, on his own land on either side of the river, all the waterfall except what belonged to the Gookins cloth-mill and the Whiting saw-mill.   His purchase of the acre in 1831 was not a creation of a mill-privilege. From 1822 to 1831 the trip-hammer privilege had been the only mill-privilege belonging to the acre; and when the deed of 1843 was made, the deeds of Hamlin Rand, to which that deed referred "for a particular description of" "the mill privilege," gave no description, particular or general, of a larger water right on the acre than the trip-hammer privilege.   Neither by conveyance nor by use had any greater right been established or recognized as a mill-privilege on that lot.

In 1832, when Hamlin Rand could use on his own land on either side of the river all the waterfall except what belonged to the Gookins cloth-mill and the Whiting saw-mill, he leased to Boynton, for $5 a year, a right to draw water from the pond across the acre to Boynton's tannery for grinding bark, fulling, and rolling leather, and filling vats, with a stipulation that Boynton should not "draw the water from said pond so as in any way or at any time to interfere with the rights and privileges incident to the mills on the easterly side of said river, or draw any water when it may be wanted for the said mills," and that the lease should become void, "at the option of the said Hamlin," if he "should erect a factory or mill of any description on" the acre, or sell the acre "to any person for the purpose of erecting mills or factories."   If this lease is competent evidence of the meaning of "the mill priv-

ilege" in the deed of 1843, its stipulation in favor of the existing mills tends to show that, in the dry season at least, "the canal water privilege" of the east side did not leave half of the waterfall to be used on the west side, and that the mills and factories which Hamlin could erect on his acre could not take half of the waterfall at all seasons without moving a part of "the canal water privilege" across the river. The lease has no tendency to show that at its date in 1832 an unemployed half of the waterfall was, or was understood or intended to be, a mill-privilege on the acre. Hamlin's right to build mills and factories on his own land on either side of the river, and to use in them all the waterfall except what belonged to the Gookins and Whiting mills, is not evidence of a division of the waterfall into two equal parts, and an annexation of one half to his unoccupied acre, and of the other half less the Gookins and Whiting rights to his part of the occupied mill lot. If he had intended to use, on his acre, or on his part of the mill lot, one tenth, or one half, or the whole of the surplus left by the canal, his unexecuted intention would not have created on either lot a mill-privilege of the intended size. There is no proof of an intention formed by him to use half of the waterfall on the acre. It does not appear that he ever determined to build a mill there, or to use there any part of his water-power. There is no evidence, presumption, or apparent probability that he contemplated any use of the acre that would deprive his part of the mill lot of any power furnished by the canal and carefully guarded in the Boynton lease. There may be some reasons for holding that "the mill privilege connected" with "the tannery land" was the privilege leased to Boynton for tannery use. But the defendants disclaim that construction.

The construction of the deed of 1812, Swan to Whiting, is material. Both parties in this case have no more of the water-power than was left in Swan by that deed. The plaintiffs are not estopped to deny that the defendants have half of the power. The deeds of 1843, 1831, 1824, and 1822 are quitclaims; and so far as this case is concerned, all the titles passed that the grants of those deeds purported to convey: nothing remained to be done by the estopping force of covenants. There was no act, and no word written or spoken, by which Robert Rand was led to believe in and act upon any condition of rights or titles, or any state of things that did not exist. He claimed, not half of the river, but half of each of a large number of parcels of real estate of which Hamlin held the legal title at the time of his death. Among those parcels were the acre on the west side of the river, the grist-mill, and Hamlin's part of the mill lot on the east side, and all the water-power except what belonged to the Gookins cloth-mill and the Whiting saw-mill. Robert had no legal title; and the referee has not found that he had any equitable title. His claim was compromised and settled by the deed of 1843, which conveyed to

him all the title Hamlin had to a large number of lots in the towns of Lisbon, Landaff, Bath, Lyman, and Whitefield. If Robert had claimed one tenth or the whole of the title held by Hamlin, his claim would not have been competent evidence of the meaning of "the mill privilege" "for a particular description" of which his deed refers to the deeds of Hamlin. It does not appear that the fourteen lots conveyed to Robert by Hamlin's heirs were, or were estimated to be, equal in value to the amount of Robert's claim, or that the compromise was made on a basis that would give him, in addition to thirteen lots and the acre, either half of the power of the river, or half of Hamlin's water title. The defendants' claim, that "the mill privilege" conveyed to Robert by the compromise deed included more than half of Hamlin's water-power, is supported by no evidence, and is disproved by the deeds to which that deed refers for a particular description.

*Case discharged.*

SMITH and CARPENTER, JJ., did not sit: the others concurred in the result.